**BRANDEIS INTSEL LIMITED, Petitioner,**

v.

**CALABRIAN CHEMICALS CORPORATION, Respondent.**

**No. 85 Civ. 5633–CSH.**

United States District Court, S.D. New York.

Jan. 5, 1987.

Baer, Marks & Upham, New York City; Eugene R. Scheiman, Kathryn Weg Brandt, of counsel, for petitioner.

Scheffler, Karlinsky & Stein, New York City; Robert P. Stein, Susan Barry, of counsel, for respondent.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Petitioner Brandeis Intsel Limited ("Brandeis") moves for an order confirming an arbitration award rendered in its favor and against respondent Calabrian Chemicals Corporation ("Calabrian") following arbitration before the London Metal Exchange ("LME"), pursuant to an arbitration agreement contained in a written contract of sale pursuant to which Calabrian agreed to sell, and Brandeis agreed to purchase, a quantity of cuprous chloride.[1] Jurisdiction in this Court is based on 9

---

1. When Brandeis first demanded arbitration following the events described *infra*, Calabrian through American counsel initially denied the existence of a binding and enforceable arbitration agreement. But Calabrian did not press that point in London, the designated situs of the arbitration. Instead it instructed counsel and presented evidence and arguments before the arbitrators. Calabrian does not now urge before this Court the absence of an arbitration agreement as a ground for vacating the award. Nor, in these circumstances, could it do so. Calabrian comes before this Court in the posture of a party having agreed to arbitrate this dispute in London under the LME rules.

U.S.C. § 203, which empowers federal district courts to hear cases to recognize and enforce foreign arbitral awards. 9 U.S.C. § 203 forms a part of Chapter 2 of the Federal Arbitration Act, 9 U.S.C. §§ 201–208, which implements the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "Convention").

Respondent Calabrian has cross-moved to vacate the LME arbitration award.

For the reasons which follow, the motion of Brandeis to confirm the award is granted, and the cross-motion of Calabrian for vacatur is denied.

### I.

Brandeis is an international trading company located in London, England. It is one of 52 member companies of the LME.

The LME was first formally established in 1877. It performs the basic functions of a commodities exchange. The LME registers daily price quotations in respect of the supply of and demand for metals; it acts as a physical market where metals can be bought or sold at any time; and it provides facilities for "hedging" and so enables all those connected with the metal trade to make off-setting purchases or sales against their firm commitments.[2]

Calabrian is a New York corporation with its principal office in Houston, Texas. It is engaged in the sale and distribution of industrial chemical products. Calabrian is not a member of, and has no connection or affiliation with, the LME. Prior to the contract in suit, Calabrian had never done business with any LME member. However, Calabrian is not an entire stranger to the United Kingdom. Calabrian retains AIC Chemicals, Ltd. ("AIC") as its sales representative in the United Kingdom.

In early 1984, Brandeis entered into negotiations with Danubiana, a Rumanian company, which desired to purchase 60 metric tons of cuprous chloride. A representative of Brandeis "approached" (I have quoted the arbitrators' award) Calabrian as manufacturers of cuprous chloride for an offer. Calabrian referred Brandeis to AIC as Calabrian's U.K. agent. The subsequent negotiations took place between employees of Brandeis and Mr. Peter le Maistre, a director of AIC. Ultimately, AIC confirmed to Brandeis Calabrian's contract to sell 60 metric tons of cuprous chloride to Brandeis at a price of $1,700 per metric ton, C & F Rotterdam. Brandeis contracted to sell the same quantity to Danubiana at $1,798 per metric ton.

Calabrian shipped the indicated quantity on board the motor vessel TOLUCA, which sailed from Houston for Antwerp on May 9, 1984. The cuprous chloride had been packed in 1,323 plastic pails (or drums), which were placed on 48 pallets and stowed in three containers.

The TOLUCA reached Antwerp on June 5, 1984 and there discharged the three containers, from whence they were delivered by road to a Rotterdam warehouse, two arriving on June 5 and the third on June 8.[3] Damage to the shipment was discovered when the containers were opened. A Lloyds surveyor ascribed the damage to "weak pallets and too much free space in the containers which enabled the pallets to shift." Award at ¶ 10. That initial survey described 35 pails as "cracked/losing contents." The other pails were in their "original state"; "repalletised"; or "loose." *Ibid.*

These observations gave rise to further surveys, correspondence, telexes, demands, silences, rejections and refusals which the arbitrators detail in their award. Ultimately, on August 8, 1984, Brandeis advised Calabrian that it had rejected the shipment in its entirety, and requested a replacement in 30 days. On August 10, AIC passed on Calabrian's reply, which refused rejection and replacement.

---

**2.** I have derived this description of the LME's history and functions from a pamphlet published by the LME, attached as Ex. A to the reply affidavit of Robert Coglindro, vice-president of Calabrian.

**3.** The arbitrators' award, at ¶ 9, describes these events at Antwerp and Rotterdam as occurring in May 1984. It is common ground that the arbitrators meant June, not May.

Brandeis thereupon sought arbitration with Calabrian before the LME in accordance with the arbitration agreement in its contract with Calabrian. The arbitrators concluded, in summary, that Brandeis was entitled to reject the goods, and to recover from Calabrian the sum of $102,000, plus interest and related costs of coping with the goods following discharge. The award totals $115,664.40. The arbitrators further directed that Calabrian pay the arbitration costs and fees, in the total amount of £2,258.75, with the further provision that if Brandeis paid those costs to the LME, Brandeis should be reimbursed by Calabrian. It is not clear from the motion papers whether in fact such costs have been paid by Brandeis, and are now sought from Calabrian.

## II.

The first point that Calabrian makes in its effort to vacate the award is that the arbitrators acted in "manifest disregard" of the law, a phrase derived from the decision of the United States Supreme Court in *Wilko v. Swan*, 346 U.S. 427, 436, 74 S.Ct. 182, 187, 98 L.Ed. 168 (1953).

Before considering *Wilko v. Swan* and subsequent American decisions interpreting it, one must take into account the Convention, which governs the cross-motions in this case.

Chapter 2 of the Federal Arbitration Act, at 9 U.S.C. § 207, requires this Court to confirm the award "unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the ... Convention." This implicates Article V of the Convention, which sets forth the bases upon which recognition and enforcement of a foreign arbitral award may be refused. "Foreign awards are vulnerable to attack only on the grounds expressed in other articles of the Convention, particularly Article V." *Fotochrome, Inc. v. Copal Company, Limited,* 517 F.2d 512, 518 (2d Cir.1975). *See also Ipitrade International S.A. v. Federal Republic of Nigeria,* 465 F.Supp. 824, 826 (D.D.C.1978) ("Article V of the Convention specifies the only grounds on which recog-

nition and enforcement of a foreign arbitration award may be refused.").

The ground in Article V upon which Calabrian relies appears in Article V(2)(b), which provides:

"Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that: ...

"(b) The recognition or enforcement of the award would be contrary to the public policy of that country."

In the case at bar, Calabrian's first effort to vacate the arbitrators' award comes down to this. *Wilko v. Swan, supra,* suggests that an arbitration award is vulnerable in the federal courts for "manifest disregard" of the law. This concept should be raised to the level of "public policy" within the context of Article V of the Convention. Since, in Calabrian's submission, the English arbitrators were guilty of manifest disregard of law, American public policy requires that the award be vacated.

The arbitrators, in ruling in favor of Brandeis, purported to interpret and apply the Sale of Goods Act of 1979, which Calabrian says is the "English equivalent" of the Uniform Commercial Code in this country. Brief at 18. Calabrian makes an extended argument as to why the arbitration award flies in the face of that statute. However, in the view I take of the case I need not reach that issue.

In *Wilko v. Swan*, the Supreme Court construed Chapter 1 of the Federal Arbitration Act, within the context of the federal securities laws and a contract for purchase of securities containing an arbitration clause requiring arbitration before an American stock exchange. The Court held that the arbitration agreement was void under the federal securities statutes, notwithstanding the seemingly broad provisions of the federal arbitration statute. During the course of its opinion, the Court in *Wilko v. Swan* said this:

"In unrestricted submissions, such as the present margin agreements envisage, the interpretations of the law by the arbitrators in contrast to manifest disregard are

not subject, in the federal courts, to judicial review for error in interpretation." 346 U.S. at 436–37 (footnote omitted).

As the Second Circuit justly observed in *I/S Stavborg v. National Metal Converters, Inc.*, 500 F.2d 424, 430 n. 13 (2d Cir. 1974), the quoted sentence from *Wilko* is "ungrammatical in structure" and "unnecessary to the decision." Nonetheless, succeeding generations of losing parties in arbitration have relied upon *Wilko*'s "manifest disregard" phrase in efforts to vacate domestic arbitration awards.

These efforts to vacate arbitration awards have met an almost total lack of success. The Supreme Court has not again addressed the issue, or further defined the phrase. Various circuit courts of appeal recognize the existence of "manifest disregard" of law as a ground for vacating an award existing independently of the grounds specified in 9 U.S.C. § 10. However, those decisions define the phrase in the narrowest possible terms, and invariably conclude that the phrase, so defined, does not meet the facts of the particular case. Thus Judge Friendly wrote in *Drayer v. Krasner*, 572 F.2d 348, 352 (2d Cir.), *cert. denied*, 436 U.S. 948, 98 S.Ct. 2855, 56 L.Ed.2d 791 (1978):

> "Insofar as *Wilko v. Swan*, 346 U.S. 427, 436–37, 440, 74 S.Ct. 182, 98 L.Ed. 168 (1953), introduced the nonstatutory ground of 'manifest disregard' of the law as a basis for vacating arbitration awards, this presupposed 'something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law.' *San Martine Compania de Navegacion, S.A. v. Saguenay Terminals Ltd.*, 293 F.2d 796, 801 (9 Cir.1961); *Saxis S.S. Co. v. Multifacs Int'l Traders, Inc.*, 375 F.2d 577, 581–82 (2 Cir.1967); see also *Sobel v. Hertz, Warner & Co.*, 469 F.2d 1211, 1214 (2 Cir.1972)."

The Second Circuit declined to find a "manifest disregard" of the law by the arbitrators in *Drayer*, as it has also done in *Trafalgar Shipping Co. v. International Milling Co.*, 401 F.2d 568, 573 (2d Cir.1968) ("manifest disregard" of law is an exception to the enforceability of arbitration awards that must be "severely limited"); *see also Andros Compania Maritima S.A. v. Marc Rich & Co., A.G.*, 579 F.2d 691, 703 (2d Cir.1978); *National Bulk Carriers, Inc. v. Princess Management Co., Ltd.*, 597 F.2d 819, 825 (2d Cir.1979). *Compare Sheet Metal Workers International Association Local Union No. 420 v. Kinney Airconditioning Co.*, 756 F.2d 742, 746 (9th Cir.1985) (court observed that "[in]dependent of section 10 of the Act, a district court may vacate an arbitral award which exhibits manifest disregard of the law," but declined to find such disregard on the facts).

The Second Circuit's most recent discussion appears in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930 (2d Cir.1986). A stock broker cancelled its customer's short sale. The resulting arbitration before the New York Stock Exchange turned on whether the sale violated federal securities laws and regulations. The arbitrators concluded it did not and awarded damages to the customer. The broker persuaded this Court (Weinfeld, J.) that the arbitrators had acted in "manifest disregard" of the securities laws. Judge Weinfeld vacated the award. The Second Circuit reversed. Judge Mansfield wrote:

> " 'Manifest disregard of the law' by arbitrators is a judicially-created ground for vacating their arbitration award, which was introduced by the Supreme Court in *Wilko v. Swan*, 346 U.S. 427, 436–37 [74 S.Ct. 182, 187–88] (1953). It is not to be found in the federal arbitration law. 9 U.S.C. § 10. Although the bounds of this ground have never been defined, it clearly means more than error or misunderstanding with respect to the law. *Siegel v. Titan Indus. Corp.*, 779 F.2d 891, 892–93 (2d Cir.1985); *Drayer v. Krasner*, 572 F.2d 348, 352 (2d Cir.), *cert. denied*, 436 U.S. 948 [98 S.Ct. 2855, 56 L.Ed.2d 791] (1978); *I/S Stavborg v. National Metal Converters, Inc.*, 500 F.2d 424, 432 (2d Cir.1974). The error must have been obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator. Moreover, the term 'dis-

regard' implies that the arbitrator appreciates the existence of a clearly governing legal principle but decides to ignore or pay no attention to it. *Bell Aerospace Company Division of Textron, Inc. v. Local 516,* 356 F.Supp. 354, 356 (W.D.N.Y.1973), *rev'd on other grounds,* 500 F.2d 921 (2d Cir.1974). To adopt a less strict standard of judicial review would be to undermine our well established deference to arbitration as a favored method of settling disputes when agreed to by the parties. *United Steelworkers v. American Manufacturing Co.,* 363 U.S. 564 [80 S.Ct. 1343, 4 L.Ed.2d 1403] (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574 [80 S.Ct. 1347, 4 L.Ed.2d 1409] (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593 [80 S.Ct. 1358, 4 L.Ed.2d 1424] (1960); *Saxis Steamship Co. v. Multifacs International Traders, Inc.,* 375 F.2d 577 (2d Cir.1967). Judicial inquiry under the 'manifest disregard' standard is therefore extremely limited. The governing law alleged to have been ignored by the arbitrators must be well defined, explicit, and clearly applicable. We are not at liberty to set aside an arbitration panel's award because of an arguable difference regarding the meaning or applicability of laws urged upon it." At 933–34.

Judge Mansfield's opinion, in which Judge Miner joined, went on to express his view that the arbitrators correctly interpreted the securities laws. Judge Meskill, concurring in the result, found that additional exercise quite unnecessary. He wrote:

"In reviewing an arbitrators' decision, manifest disregard of the law may be found only where the arbitrators ' "understood and correctly stated the law but proceeded to ignore it." ' *Siegel v. Titan Industrial Corp.,* 779 F.2d 891, 893 (2d Cir.1985) (quoting *Bell Aerospace v. Local 516,* 356 F.Supp. 354, 356 (W.D.N.Y. 1973), *rev'd on other grounds,* 500 F.2d 921 (2d Cir.1974). . . ."

\*   \*   \*   \*   \*   \*

"Whether the majority disagrees with Judge Weinfeld's decision on the merits is entirely beside the point. The standard of manifest disregard was adopted to insulate arbitration decisions from precisely this kind of inquiry. *See Wilko v. Swan,* 346 U.S. 427, 436–37 [74 S.Ct. 182, 187–88] (1953). The majority opinion in this case perpetuates the district court's error by reversing the district court on the merits of the arbitrators' decision and by engaging in unnecessary speculation over the validity of Rule 10b–4. We need not express any view on the correctness of the arbitrators' or district court's decision. All that is needed here is a recognition of the arbitrators' efforts to apply an unclear rule of law to a complex factual situation. When the appropriate legal principles are applied, it is clear that the arbitration panel did not act in manifest disregard of the law." At 937–38.

■ We see then that American courts are unreceptive, to say the least, to arguments that arbitral awards should be vacated for manifest disregard of law. But I conclude that, in any event, the "manifest disregard" defense is not available to Calabrian. That is because "manifest disregard" of law, whatever the phrase may mean, does not rise to the level of contravening "public policy," as *that* phrase is used in Article V of the Convention. Nor, unlike proceedings under Chapter 1 of the Federal Arbitration Act, can manifest disregard of law be urged as an independent ground for vacating an award falling within the Convention.

In *Parsons & Whittemore Overseas Co., Inc. v. Societe Generale de L'Industrie du Papier (RAKTA),* 508 F.2d 969, 974 (2d Cir.1974), the Second Circuit stated generally that:

"... The Convention's public policy defense should be construed narrowly. Enforcement of foreign arbitral awards may be denied on this basis only where enforcement would violate the forum state's most basic notions of morality and justice."

More recently, in *Waterside Ocean Navigation Co., Inc. v. International Navigation Ltd.,* 737 F.2d 150, 152 (2d Cir.1984)

Chief Judge Feinberg said of the Article V(b)(2) "public policy" defense that it:

"... must be construed in light of the overriding purpose of the Convention, which is 'to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries,' *Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 520 n. 15, 94 S.Ct. 2449, 2457 n. 15, 41 L.Ed.2d 270 (1974); see *Bergesen v. Joseph Muller Corp.,* 710 F.2d 928, 933 (2d Cir.1983); *Fotochrome, Inc. v. Copal Co.,* 517 F.2d 512, 516 (2d Cir.1975); *Parsons & Whittemore Overseas Co. v. Societe Generale de l'Industrie du Papier,* 508 F.2d 969, 973 (2d Cir.1974). Thus, this court has unequivocally stated that the public policy defense should be construed narrowly. It should apply only where enforcement would violate our 'most basic notions of morality and justice.' *Fotochrome, Inc., supra,* 517 F.2d at 516; *Parsons & Whittemore, supra,* 508 F.2d at 974."

The Second Circuit affirmed the confirmation, under the Convention, of charterparty arbitration awards rendered in London, rejecting the argument that to do so would offend American public policy.

Other circuits, while using somewhat different phraseology, have applied comparably narrow definitions to "public policy" as a ground for refusing enforcement of an arbitration award. Article V(2)(b) of the Convention was considered in *Laminoirs v. Southwire Co.,* 484 F.Supp. 1063, 1068 (N.D.Ga.1980), where the court, in addition to citing *Parsons,* referred to *Gulf States Telephone Co. v. Local 1692, International Brotherhood of Electrical Workers,* 416 F.2d 198, 201 (5th Cir.1969). In *Gulf States* the Fifth Circuit observed, within the context of a domestic arbitration award, that enforcement of an arbitral award will be denied if "it compels violation of law or conduct contrary to accepted public policy...." (footnote omitted). The District of Columbia Circuit employed the same phrasing, also with reference to a domestic award, when it wrote in *Revere Copper & Brass Inc. v. Overseas Private Investment Corporation,* 628 F.2d 81, 83 (D.C.Cir.), *cert. denied,* 446 U.S. 983, 100 S.Ct. 2964, 64 L.Ed.2d 839 (1980):

"Seeking to avoid the restrictions upon our review of the award in question, Revere points to the rule that enforcement of arbitration awards is subject to public policy considerations. Revere misperceives the nature of the public policy exception to the enforcement of arbitration awards. It is not available for every party who manages to find some generally accepted principle which is transgressed by the award. Rather, the award must be so misconceived that it 'compels the violation of law or conduct contrary to accepted public policy.' *Union Employers Division of Printing Industry, Inc. v. Columbia Typographical Union No. 101,* 353 F.Supp. 1348, 1349 (D.D.C.1973), *aff'd mem.,* 160 U.S.App. D.C. 403, 492 F.2d 669 (1974). A proper description of the limits of the public policy exception is provided in *Interinsurance Exchange of Automobile Club v. Bailes,* 219 Cal.App.2d 830, 33 Cal. Rptr. 533, 538 (1963):

"'While, in one sense, all rules of adjective and substantive law set forth the "public policy" of the state, there is a vast difference between the enforcement of a void contract and the mere misunderstanding or misapplication of rules of law involved in the application to a particular dispute of a [valid] contract....'"

That distinction is illustrated by my own conclusion in *Transmarine Seaways Corp. of Monrovia v. Marc Rich & Co., A.G.,* 480 F.Supp. 352, 358 (S.D.N.Y.1979) that public policy would prevent enforcement of an arbitration award if the contract containing the arbitration agreement was procured by duress.

In *Parsons, supra,* the Second Circuit left open the question of whether the "manifest disregard" defense, derived from *Wilko v. Swan,* applies under the Convention. 508 F.2d at 977. The Court in *Waterside, supra,* did not consider the applicability of *Wilko v. Swan* to cases falling

within the Convention. But it is fair to say that the Second Circuit in *Parsons* regarded that proposition as at least doubtful, in view of its statement that "[b]oth the legislative history of Article V ... and the statute enacted to implement the United States' accession to the Convention are strong authority for treating as exclusive the bases set forth in the Convention for vacating an award." *Ibid.*[4]

In my view, the "manifest disregard" defense is not available under Article V of the Convention or otherwise to a party such as Calabrian, seeking to vacate an award of foreign arbitrators based upon foreign law. That conclusion is itself rooted in concepts of public policy. In *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n. 15, 94 S.Ct. 2449, 2457 n. 15, 41 L.Ed.2d 270 (1974), the Supreme Court said of the Convention:

> "The goal of the Convention, and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries."

That salutary goal and purpose will be better achieved by applying to proceedings brought in this country to enforce foreign arbitral awards the narrow concept of "public policy" articulated in the cases cited *supra*. Defining "public policy" as used in the Convention to include "manifest disregard" of law, the phrase tossed off by the Supreme Court in *Wilko v. Swan*, would require an American court to consider whether foreign arbitrators had disregarded governing foreign law. It is one thing to ask an American judge to hold American arbitrators guilty of a manifest disregard of American law. It is quite another to ask an American judge to determine whether foreign arbitrators manifestly disregarded the internal, substantive law of a foreign nation by which the parties agreed in their contract to be bound. That seems to me a slippery slope upon which American judges should not embark, in clear derogation of the public policy underlying the Convention.

Accordingly I hold that the "manifest disregard" defense is not available to Calabrian within the context of the Convention.

The "public policy" defense under Article V(b)(2) of the Convention remains, at least in theory. But it is clear from the cited cases that the award at bar does not contravene "public policy" as that phrase has been defined by American courts.

Calabrian contends that the arbitrators misapplied the law of sales as enacted in the United Kingdom. While yielding to no one in my respect for the law of sales, I cannot agree that, even if Calabrian is correct, enforcement of the award would violate this country's "most basic notions of morality and justice," *Parsons*, *supra*, or compel "violation of law or conduct contrary to accepted public policy," *Gulf States*, *supra*. The distinction, as pointed out in *Revere Copper & Brass*, *supra*, lies between the enforcement of a void contract "and the mere misunderstanding or misapplication of rules of law involved in the application of a particular dispute of a [valid] contract." Calabrian's attack upon this award falls within the latter category. It does not rise to the level of a challenge rooted in accepted public policy.

If I am wrong in concluding that *Wilko*'s "manifest disregard" defense is not available to awards falling under the Con-

---

4. The *Parsons* court pointed to a difference between domestic and Convention law in respect of the enforceability of arbitration agreements: "... it may well be that the special considerations and policies underlying a 'truly international agreement,' *Scherk v. Alberto-Culver Co.*, *supra*, 417 U.S. 506 at 515, 94 S.Ct. 2449 [at 2455], call for a narrower view of non-arbitrability in the international than the do-

mestic context. *Compare id.* with *Wilko v. Swan*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953) (enforcement of international, but not domestic, agreement to arbitrate claim based on alleged Securities Act violations.)"
508 F.2d at 974–75.
The enhanced invulnerability, under the Convention, of foreign arbitration to challenge logically extends to confirmation of an award.

vention, then the question arises whether the present arbitrators can be said to have acted in manifest disregard of the United Kingdom's Sale of Goods Act of 1979.

As appears from their award, the arbitrators concluded on the basis of physical evidence at the place of delivery that damage to the shipment was "initiated by the inadequate stowage" chargeable to Calabrian. In consequence, the goods were not delivered "in a merchantable condition on arrival." Brandeis was entitled by Section 34(1) of the Sales Act to take "conditional property" in the goods, and was further entitled "to reject the goods in toto on 8th August, which was reasonable time for rejection." Conclusions of Award at ¶ 3.

Calabrian assails these conclusions. With copious references to the arbitration record, it argues, in essence, that the number of damaged pails was so small in relation to the total that rejection of the shipment was not justified; that contemporaneous declarations of Brandeis showed that in fact Brandeis had accepted the balance of the shipment outright, not just conditionally; that its ultimate rejection of the entire shipment was unreasonable and contrary to law; and that the arbitrators aided and abetted Brandeis in a wrongful thrusting upon Calabrian of Brandeis's loss when, for unknown reasons, Brandeis's customer Danubiana failed to take delivery of the shipment.

■■■ These arguments are made plausibly and with professional skill. But they do not demonstrate "manifest disregard" of controlling English sales law by the arbitrators, as American courts define that phrase. "Manifest disregard" does not confer upon the courts "a license to review the record of arbitrable proceedings for

errors of fact or law," *Parsons* at 977. With Judge Meskill, concurring in *Merrill Lynch,* I do not find it necessary or appropriate to agree or disagree with the arbitrators' conclusions. It is sufficient to say that their award reflects the arbitrators' awareness of the governing statute and efforts to apply its terms to the facts as found. The legal consequences of the quantum of damage, the effect to be given to the parties' utterances, the reasonableness of rejection of the goods: these are issues that frequently arise in sales disputes, and I am "not at liberty to set aside an arbitration panel's award because of an arguable difference regarding the meaning or applicability of laws urged upon it." Mansfield, Ct.J., in *Merrill Lynch* at 934.

### III.

Alternatively, Calabrian attacks the award on the basis of the "bias and partiality of the LME and its arbitrators in favor of Brandeis, an LME member, and against Calabrian, a foreigner with no LME affiliation or connection...." Brief at 24. This perceived "old boy network" problem is said to be exacerbated by the fact that arbitrator Beale's employer, Amalgamated Metal Trading, Ltd., sits with Brandeis on a 28–member committee of the LME known as the "Ring."[5] These relationships, Calabrian argues, give rise to an impermissible "appearance of bias" under *Coatings Corp. v. Continental Casualty Company,* 393 U.S. 145, 150, 89 S.Ct. 337, 340, 21 L.Ed.2d 301 (1968). In addition, Calabrian contends that the arbitrators' award is so unfair as to demonstrate the fact of impartiality.[6]

As noted, the Convention defines the grounds upon which the award can be chal-

---

5. Calabrian's brief stresses the fact that it did not select Mr. Beale as an arbitrator, the LME appointed him. That occurred only because Calabrian declined to select any arbitrator. Mr. Beale was then appointed by the LME Committee to act as arbitrator for Calabrian, in accordance with the LME arbitration rules to which Calabrian agreed. The fact that Calabrian did not select Mr. Beale counts for nothing on the present motions.

6. The latter argument contains a certain element of bootstrap, although I recognize that in *San Martine Compania de Navegacion, S.A. v. Saguenay Terminals Ltd.,* 293 F.2d 796, 801 (9th Cir.1961), the Ninth Circuit acknowledged that manifest disregard of law could be regarded as evidence of "partiality" within the meaning of 9 U.S.C. § 10(b). However, since I have held that "manifest disregard" of law is not a viable defense under the Convention, and that in any event manifest disregard is not shown, the point does not arise.

lenged. I accept that the propriety of the makeup of an arbitration panel sufficiently implicates public policy to fall within Article V(2)(b) of the Convention, having so held in *Transmarine Seaways Corp. of Monrovia v. Marc Rich & Co., A.G.,* supra, at 357.

However, there is no substance to Calabrian's claim. Acting through AIC, its London sales representative presumably familiar with the workings of the LME, Calabrian entered into an agreement to arbitrate disputes under the LME rules. True enough, Brandeis is a member of LME and Calabrian is not; but that is hardly a sufficient basis to invalidate LME arbitration procedures as contrary to domestic public policy.

█ Undoubtedly arbitrators Lubett and Beale were more familiar with the principals of Brandeis, a fellow LME member, than they were with Calabrian. But that is not enough to create an impermissible "appearance of bias," as the Supreme Court used that phrase in *Commonwealth Coatings.* The arbitration award was vacated in *Commonwealth Coatings* because an arbitrator failed to disclose a direct, income-producing relationship between himself and one of the parties. The cases in this circuit applying *Commonwealth Coatings* to question an arbitrator's impartiality all deal with direct financial or professional relationships between an arbitrator and a party. *See Andros Compania Maritima S.A. v. Marc Rich & Co., A.G.,* 579 F.2d 691 (2d Cir.1978) and cases cited at 699–700; *Transmarine Seaways Corp.,* supra, at 357–58.

The members of the LME, while known to each other commercially, sometimes deal with each other, and sometimes compete with each other directly. The fact of the matter is that arbitration of metal contracts disputes before the LME makes available to the parties "prominent and experienced members of the specific business community in which the dispute to be arbitrated arose"; no appearance of bias arises from the fact that, in such a community, "the wakes of the members often cross." *International Produce, Inc. v. A/S Ros-*

*shavet,* 638 F.2d 548, 552 (2d Cir.), *cert. denied,* 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981) (fact that neutral arbitrator was a nonparty witness to another arbitration involving the same law firms as were involved in the instant arbitration did not require disqualification).

The rationale of *Rosshavet* is closer to the case at bar than those cases upon which Calabrian relies, in which courts vacated arbitration awards rendered pursuant to arbitration agreements requiring arbitration before the executive board of the labor union to which one party, but not the other, belonged.

Typical of this line of cases is *Taylor v. Nelson,* 615 F.Supp. 533 (W.D.Va.1985), *rev'd on other grounds,* 788 F.2d 220 (4th Cir.1986). Taylor, a music promoter, contracted with Nelson, a popular and prominent musician, to perform at a music festival sponsored by Taylor. Nelson was a member of the American Federation of Musicians ("AFM"). If promoters wished to engage the services of AFM members, they had to enter into the standard form AFM contract, which provided that the sole forum for resolution of disputes was an arbitration conducted by the executive board of the AFM. This arrangement, in the district judge's view, was one "which smacks of adhesion," 615 F.Supp. at 536; he declined to enforce the award in Nelson's favor.

I do not see that the contract at bar "smacks of adhesion." Calabrian, a New York corporation maintaining its principal office in Houston and a sales representative in London, would appear to enjoy some degree of commercial sophistication and clout. It did not have to agree to the terms proposed by Brandeis, but having done so, is bound by them.

There is no suggestion in the record of that sort of direct, pecuniary relationship between either arbitrator and Brandeis which is condemned by the American cases cited *supra.* Nor is there any reason to doubt, as Brandeis's reply papers assert, that Messrs. Lubett and Beale are respected and experienced citizens of this specialized commercial world.

There is no basis to vacate the award for partiality, arbitrators' misconduct, or appearance of impropriety.

### IV.

The final point for decision is that of interest on the award.

The arbitrators awarded pre-award interest at 11.25% per annum. They made no award of post-award interest, although "arbitrators in many jurisdictions—including New York—have granted such interest." *Waterside Ocean Navigation Co. Inc. v. International Navigation Ltd.*, 737 F.2d 150, 154 (2d Cir.1984) and cases cited. "Also, district judges in the Southern District of New York have granted post-award, prejudgment interest in both domestic and foreign arbitration cases" (cases cited). *Ibid.* In *Waterside,* the Second Circuit held that the Convention did not preclude the district court from granting post-award pre-judgment interest in an action to confirm a foreign arbitral award, even where the arbitrators had made no such award.

Where a party resisting an arbitration award can demonstrate that the foreign law pursuant to which the arbitrators awarded interest "is penal only and relates to the punishing of public wrongs as contradistinguished from the redressing of private injuries," the arbitrators' award of interest is unenforceable as contrary to the public policy of this country. *Laminoirs v. Southwire Company, supra,* 484 F.Supp. at 1069.

In the case at bar, Calabrian has made no showing that the arbitrators' rate of 11.25% per annum, which the arbitrators did not explain, should be regarded as "penal" under English law. Nor have they pointed to any other expression of accepted public policy which would preclude the arbitrators' grant to Brandeis of pre-award interest, either in principle or in the amount determined by the arbitrators. Calabrian refers to 28 U.S.C. § 1961(a), which provides that in money judgments recovered in civil cases in a federal district court, interest "shall be calculated from the date of the entry of the judgment...." I do not regard this provision as precluding enforcement, under the Convention, of a pre-award grant of interest by foreign arbitrators acting under foreign law, at least in the absence of a showing that under foreign law the interest is penal in nature.

### Conclusion

The motion of Brandeis to confirm the award of arbitrators is granted.

The cross-motion of Calabrian to vacate the award is denied.

Counsel for Brandeis are directed, within ten (10) days of the date of this Opinion, to settle a judgment consistent with this Opinion on five (5) days' notice. If counsel for Brandeis are so advised, they may include a provision for post-award pre-judgment interest, on the authority of *Waterside Ocean Navigation Co. Inc. v. International Navigation Ltd., supra.*

The foregoing is SO ORDERED.