**PAGE INTERNATIONAL LTD., Petitioner,**

v.

**ADAM MARITIME CORP., et al., Respondents.**

**No. 99 Civ. 1503(RMB).**

United States District Court, S.D. New York.

May 18, 1999.

---

James M. Textor, Cichanowicz, Callan, Keane, Vengrow & Textor LLP, New York City, for petitioner Page International Ltd.

James D. Kleiner, Piper & Marbury, New York City, for respondents Adam Maritime Corp. and Glencore Ltd.

### ORDER

BERMAN, District Judge.

## I. INTRODUCTION

Petitioner Page International Ltd. ("Page") moves pursuant to Section 9 of the Federal Arbitration Act, 9 U.S.C. § 9, for an order confirming a Maritime Arbitration Award (the "Award") issued on December 11, 1998. Respondents Adam Maritime Corp. ("Adam") and Glencore Ltd. ("Glencore") cross-move to vacate the award pursuant to Section 10 of the Federal Arbitration Act, 9 U.S.C. § 10. The Award was made by a panel of three arbitrators from the Society of Maritime Arbitrators; one arbitrator dissented. **For the reasons set forth below, the motion to confirm the Award is granted, and the cross-petition to vacate the Award is denied.**

## II. FACTS

The evidence adduced at the arbitration established the following: On or about January 17, 1994, Page entered into a so-called Asbatankvoy form of written maritime charter party contract with Adam for the charter by Adam of the MV Saint Vassilios (the "vessel"), which was owned by Page. Adam is a chartering subsidiary of Glencore, a commodity trading company. Adam chartered the vessel to carry a cargo of No. 6 fuel oil (which is a blend of low sulfur waxy residual ("LSWR") fuel routinely used by public utility power generating plants) from Freeport, Bahamas to New York. Glencore had purchased the fuel from Enjet and resold it on January

19, 1994 to Con Edison for delivery in New York.

The dispute between Page and Adam occurred in the following context: On January 17, 1994, the cargo of fuel oil was loaded onto the vessel in Freeport, Bahamas at the BORCO terminal by Adam's supplier, Enjet. The cargo, which was initially held in shore tanks, was heated and pumped by BORCO terminal employees and blended in the vessel's cargo tanks, presumably in accordance with written instructions provided by Adam's cargo inspectors and terminal representatives. According to these instructions, the cargo was to be heated and loaded by Adam's representatives at a minimum of 30 degrees above the "pour point" or at 135 degrees Fahrenheit ("F.") whichever is higher.[1] Because No. 6 fuel is a thick "dirty" fuel, it requires a relatively high amount of heat in order for it to flow.

As the Bahamas loading operation progressed, the ship's crew noticed that the cargo temperature aboard the vessel was about 120 F. and, accordingly, that the loading rate was slow. The vessel personnel requested that the terminal increase both the loading rate and temperature. When this was not accomplished, the vessel Master issued a Note of Protest which stated that the cargo temperature was approximately 120 F. **It was undisputed by Adam and crucial to the Arbitration Majority (the "Majority") that the temperature at which Adam's agents loaded the cargo was too low.** (Decision and Award at 7.)

The principal dispute in the arbitration was over which party was responsible for the congealed fuel oil which ultimately clogged vessel pipelines and which caused Page considerable offloading expense in New York. At some point after the loading in the Bahamas was begun, vessel personnel discovered that the deck cargo pipelines of the vessel were clogged with congealed fuel oil. The precise point at which this discovery was made was (factually) disputed by the parties. Page's contention (with which the Majority agreed) was that during the loading of the fuel oil in the Bahamas, vessel personnel noticed an irregular increase in pressure in the vessel's manifold and attributed this problem to a faulty deck valve. When vessel personnel checked the valve, however, it appeared to be working. (Dissent at 2.) Page further contended that, after the loading was completed and the vessel was en route to New York, the crew removed the suspect valve and found the lines clogged with cargo. (Decision and Award at 7.) The oil was then heated but, nonetheless, remained clogged in the pipelines upon arrival in New York on January 27, 1994. Substantial documentary evidence prepared by vessel personnel as well as their live testimony at the arbitration, corroborated Page's claim that vessel personnel became aware of the clogged pipelines only after the departure from the load port. (Decision and Award at 6–7.)

Adam claimed that Page was responsible for the clogging in the pipelines because, Adam alleged, Page personnel on board the vessel during the voyage failed properly to drain the deck lines and allowed the cargo to sit in some deck lines for lengthy periods of time. Adam further claimed that Page vessel personnel erased two log entries and, thereafter, gave false testimony at the arbitration allegedly to conceal their own negligence with respect to the fuel cargo. Adam argued that because log entries were erased, the Majority should have drawn an adverse (evidentiary) inference and ruled in favor of Adam.

The vessel arrived in New York on January 27, 1994, where cargo was to be offloaded onto a fuel barge. The cargo could not readily be pumped from the vessel, however, because the fuel oil had congealed and clogged the vessel's deck lines. The blockage was finally cleared, and off-

---

1. A fuel's "pour point" is determined by chemists in a laboratory at the load port. The pour point is the temperature below which the fuel will cease to flow.

loading was completed, but only after substantial delay and expense were incurred by Page.

## Arbitration Proceedings

To resolve their dispute, and pursuant to Clause 24 of the charter party contract, the parties resorted to arbitration by three Maritime arbitrators in New York City (one arbitrator was appointed by each of the parties and the third arbitrator was chosen by the first two arbitrators). The arbitration panel (the "Panel") held multiple hearings over a period of approximately two years during which time the Panel heard the live testimony of six witnesses and reviewed "numerous documents" in the form of exhibits. Written legal (post hearing and reply) briefs were submitted to the Panel by the parties at the conclusion of the arbitration hearings.[2]

During the arbitration, Page called the Master and Chief Mate of the vessel as witnesses and offered documentary evidence regarding the events at the load and discharge ports, including all vessel logs and cargo operations records. Page also offered expert witness testimony. Adam called two commercial chartering witnesses as well as an expert witness. All hearings were conducted by the Panel in New York City. On December 11, 1998, the Majority issued an award to Page in the amount of $454,560.14 plus interest at 8.25% after January 10, 1999.

The Majority found that Adam, as Charterer, had a commercial and legal obligation to inform Page and vessel personnel of the cargo's special (heating) requirements and failed to do so. (Decision and Award at 12.) **Most importantly, the Majority also found that Adam and the terminal representatives in the Baha-**mas were negligent in loading the cargo at an insufficient temperature and that this negligence caused the fuel to congeal inside the deck pipelines and proximately caused Page's damages. (Decision and Award at 11–13.) The Majority further found that the vessel personnel (*i.e.* Page's Master and Chief Mate) had no control over the loading rate or the loading temperature, as these factors were solely within the control of Adam. (Decision and Award at 14.) The Majority concluded the following:

> Given the fact that all of the vessel's deck lines drained by gravity into the cargo tanks, all [Adam] had to do was to make certain that this high pour blended LSWR material was loaded at 135 F. or 30 F. above its actual pour point whichever was higher. This was not done because the last material pumped on board from shore tanks 8040 and 8041 was too cold (115 F.) vis a vis its pour point (115 F.) No amount of cargo heating on board, even it heating had started at the commencement of loading, would have had any impact on the blocked pipelines. (Decision and Award at 11.)

The burden of proving that the Master or other ship's officers were told of the cargo's pour point rests on Charterer. In this instance, Charterer did not carry its burden. *In Sun Company, Inc. v. S.S. Overseas Arctic,* the court restated the rejection of this same argument that "The carriers have a legal duty to learn the special needs of their cargo". In *Tenneco Resins, Inc.,* the court stated "To the contrary, we have ruled that the Charterer has an obligation to inform the carrier of the cargo's special requirements." (Decision and Award at 12.) [3]

---

2. The Panel Majority observed: "The panel has thoroughly reviewed the testimony of the witnesses, the extensive documentary evidence and counsel's briefs." (Decision and Award at 11.)

3. The Majority also stated:
 If Charterer, Enjet, BORCO or Caleb Brett had evidence that fully informed the vessel, they should have presented it to the vessel. Their failure to do so led the majority to conclude that they did not inform the vessel as they should have. Although the Master was displeased with the slow rate of loading, he testified that a slow rate did not raise concern in his mind as the fuel was

The dissenting arbitrator (the "Dissent") found that the Majority "ignored" certain erased log entries, which he believed were relevant as they, perhaps, had to do with (possible) clogging in the deck line and (possible) trouble with the No. 7 gate valve in that deck line. (Dissent at 4.) Acknowledging that there was live testimony during the arbitration concerning the erasures and that it was impossible to know what the original text of the erased (and written over) log entries had been, the Dissent, nevertheless, argued that the Majority should have drawn an "adverse inference" from the entries and should have discredited the testimony of the vessel Master and Chief Mate. (Dissent at 6.) As the Dissent put it,

> **[u]nfortunately, neither the majority or myself have a clue as to what the original text of the ... erased and written over log entry may have been.** In light of this, the Panel has been denied knowledge of the **presumably relevant facts** reported in that entry, thereby frustrating any attempt to justly resolve the dispute. To prevent this very thing from occurring, there has developed over many years, in decisional law, an adverse inference which is to be taken when a party suppresses, fabricates or otherwise alters or falsifies evidence in a dispute. The underlying reasoning for this rule is that the acts [which] were falsified clearly indicate that the offending party is fearful his cause lacks truth and merit.

(Dissent at 6 (emphasis added).) Adam here claims, relying on the Dissent, that by failing to draw an "adverse inference," the Majority acted in "manifest disregard" of applicable law. (Adam Mem. at 7.) This Court rejects Adam's contention.

## III. DISCUSSION

■ The basis of review of an arbitration award is (appropriately) limited. *See In re Arbitration Between Carina International Shipping Corp. and Adam Mari-*

*time,* 961 F.Supp. 559, 563 (S.D.N.Y., 1997). Vacatur of an arbitration award is permissible only when an arbitrator has shown a "manifest disregard of the law." *See e.g., W.K. Webster & Co. v. American President Lines,* 32 F.3d 665, 669 (2d Cir. 1994). Manifest disregard of the law, in turn, requires "something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law.... Neither the erroneous application of the rules of law, nor the arbitrator's erroneous decision of the facts is ground for vacating the award." *See Siegel v. Titan Indus. Corp.,* 779 F.2d 891, 892–93 (2d Cir.1985). Manifest disregard may be found only where an arbitrator "understood and correctly stated the law but proceeded to ignore it." *See id.* at 893. Also, a Federal court may not upset the factual determinations of an arbitration panel on a confirmation motion. *See United Paperworkers International Union v. Misco, Inc.,* 484 U.S. 29, 37–38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987) ("[A] court may not reject an arbitrator's factual findings simply because the court disagrees with them.").

■ In the instant case, the principal disagreement between the Dissent and the Majority (and between Page and Adam) amounts to no more than a dispute over the facts. The Majority reviewed a wide array of evidence including, among other things, the live testimony of the vessel's Master and Chief Mate, Adam's commercial chartering witnesses, Page and Adam's experts, an extensive documentary record, and the parties' respective legal briefs. (Page Decl. at 6.) They concluded, based upon the evidence, that negligent acts in loading the cargo in the Bahamas—which they attributed to Adam—caused the oil to congeal and resulted in damage to Page. (Decision and Award at 14.) They also concluded that there were no intervening negligent acts attributable to Page which diminished

fluid enough to be pumped on board the vessel. (Decision and Award at 12.)

Adam's liability. (Decision and Award at 14.)

Among other things, the Master and Chief Mate testified at the arbitration that they were **not** informed by Adam of the high pour point and high wax content of the cargo. (Adam Mem. at 3.) After lengthy cross-examination, which included discussion of the log erasures, the Majority found the testimony of the Master and Chief Mate to be credible. (Page Decl. at 8.) With respect to the proof, the Majority noted: **"The burden of proving that the Master or other ship's officers were told of the cargo's pour point rests on [Adam]. In this instance, [Adam] did not carry its burden."** (Decision and Award at 12 (emphasis added).) The Majority considered the evidence that the cargo was loaded in the Bahamas at an improper rate and at a temperature which was too low vis-a-vis its pour point, (Decision and Award at 11), and concluded that it was Adam's negligence that caused the fuel oil to congeal, causing extensive damage to Page. (Decision and Award at 14.)

The Dissent drew a different **factual** interpretation of the evidence presented to the Panel. The Dissent believed that the vessel's Master and Chief Officer were "neglectful" in their attention to the subject cargo as it was being loaded and that those officers "orchestrated a scenario that would best serve their interests and those of the vessel's owners." (Dissent at 2.) The Dissent focused upon the two altered log entries and concluded that the Majority should have drawn an "adverse infer-ence" from them and ruled in favor of Adam. (Dissent at 2, 6–9.) According to the Dissent, this information should have led the Majority to reject the log entries (presumably as unreliable evidence) and to discredit the testimony of the Master and Chief Mate. (Dissent at 6, 8.) Adam relies upon the factual interpretation of the Dissent and asks this Court to overturn the findings of the Majority.

This Court does not believe it is its role to reevaluate, much less reverse, the Majority's factual conclusions. *See United Paperworkers International Union,* 484 U.S. at 37–38, 108 S.Ct. 364 (finding that a Federal court may not upset the factual determinations of an arbitration panel on a confirmation motion). And, even if the disagreement between the Majority and the Dissent were considered more than a factual dispute, the Court would not, here, disavow the Majority for the reasons stated herein. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker,* 808 F.2d 930, 933 (2d Cir.1986). As noted, an arbitration award will be upheld unless the arbitration panel acted in "manifest disregard of law." Manifest disregard of law is a judicially-created basis for vacating an arbitration award. *See Merrill Lynch,* 808 F.2d at 933 (citing *Wilko v. Swan,* 346 U.S. 427, 436–37, 74 S.Ct. 182, 98 L.Ed. 168 (1953)).[4]

A finding of manifest disregard will only be made where the law alleged to have been disregarded is "well defined, explicit, and clearly applicable," so that the error was "capable of being readily and instantly

---

4. The Court has considered Page's argument that the doctrine of manifest disregard of law is not (even) applicable here since the arbitral award is subject to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("the Convention"). *See Brandeis Intsel Ltd. v. Calabrian,* 656 F.Supp. 160, 166 (S.D.N.Y., 1987) (observing that the doctrine of manifest disregard is not one of the seven stated grounds for refusal to enforce an arbitral award specified in Article V of the Convention).

Page's argument is not without merit, since it does comport with the "plain meaning" of Convention Article V. However, notwithstanding *Brandeis Intsel,* which involved a foreign arbitral award, the Second Circuit has held that "[t]he Convention specifically contemplates that the state [country] in which … the award was made, will be free to set aside or modify an award in accordance with its domestic arbitral law and its full panoply of express and implied grounds for relief." *See Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.,* 126 F.3d 15, 20 (2d Cir.1997). In light of *Yusuf,* this Court considers the "merits" of Adam's "manifest disregard" claim.

perceived by the average person qualified to serve as an arbitrator." *See id.* at 933–934. Moreover, the term "disregard" implies that the arbitrator appreciates the existence of a clearly governing legal principle but decides to ignore or pay no attention to it. *See Bell Aerospace Company Division of Textron, Inc. v. Local 516,* 356 F.Supp. 354, 356 (W.D.N.Y.1973), *rev'd on other grounds,* 500 F.2d 921 (2d Cir.1974). **To adopt a less stringent standard of judicial review would be to undermine appropriate deference to arbitration as a favored method of settling disputes.** *See United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 596, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *Saxis Steamship Co. v. Multifacs International Traders, Inc.,* 375 F.2d 577, 582 (2d Cir.1967). Judicial inquiry under the "manifest disregard" standard is, therefore, extremely limited. *See Merrill Lynch,* 808 F.2d at 933.

### *Adverse Inference*

 Adam claims that because the Majority failed to apply the so-called adverse inference rule in connection with erased log entries, this Court should find that the Majority acted in manifest disregard of law. In order to modify or vacate an award on manifest disregard grounds, a court must find both (1) that the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether and (2) that the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case. *See Dirussa v. Dean Witter Reynolds Inc.,* 121 F.3d 818, 821 (2d Cir.1997). **Here, neither precondition is met.** Under the adverse inference rule, where the contents of a document are relevant to an issue in a case, the trier of fact generally may conclude from the fact of the document's non-production or destruction that the party that has caused the destruction did so out of fear that the contents would harm him. *See*

*Continental Insurance Company v. Lone Eagle Shipping Ltd.,* 952 F.Supp. 1046, 1056 (S.D.N.Y.1997). Adam claims that the Majority must have ignored the adverse inference rule because it failed to draw an adverse inference from certain erased log entries which the Dissent believed may have been applicable to the dispute. **However, it was never established that the log entries were relevant to the issues of negligence or that they were caused by Page. It is quite the opposite.** The Majority heard testimony from the Master, among others, about the log erasures and chose, as the trier of fact, to believe his account of what transpired— which was that someone else had erased the log entries and that at the time that he wrote over the erasures he did not notice that the entries in the log had been erased, much less what they (originally) contained.[5] (Tr. at 242–243.) It is clear that the Majority conducted an in depth review of all of the evidence—including the log entries—and determined that the problem with the cargo arose in the process of loading by Adam (*i.e.* before the vessel left the port) and that the erasures and any inference to be drawn from them had no relevance to and could not overcome the evidence of Adam's negligence. "Given the fact that all of the vessel's deck lines drained by gravity into the cargo tanks, all [Adam] had to do was to make certain that this high pour blended LSWR material was loaded at 135 F. or 30 F. above its actual pour point whichever was higher. This was not done because the last material pumped on board from shore tanks 8040 and 8041 was too cold (115 F.) vis-a-vis its pour point (115 F.). No amount of cargo heating on board, even if heating had started at the commencement of loading, would have had any impact on the blocked pipelines." (Decision and Award at 11.)

 Even assuming the Majority chose to ignore the adverse inference rule,

---

5. The Majority also reviewed legal arguments (*e.g.* from Adam in its Post Hearing Brief) urging the Majority to draw an adverse infer-

ence with respect to the log entries. (*See, e.g.,* Adam's Post–Hearing Br. at 13, 21–23.)

that would not be grounds for reversal of the Award, since the adverse inference rule was not "clearly applicable" to this dispute. For one thing, the "rule" is one of evidence and not of law. *See* John Henry Wigmore, *Evidence in Trials at Common Law* § 285 (1979). It is well-settled that arbitration proceedings are not bound by formal rules of evidence. *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 30, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991); *Areca, Inc. v. Oppenheimer*, 960 F.Supp. 52, 56 (S.D.N.Y.1997). By agreeing to arbitrate, a party "trades the procedures and opportunities for review of the courtroom for the simplicity, informality, and expedition of arbitration." *See Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985); *Areca, Inc.*, 960 at 56.

■ Second, an "inference", sometimes referred to as a "permissive presumption," allows, but does not require, the trier of fact to find the existence of a fact upon finding that an underlying fact has been established. *See Rivera v. Coombe*, 534 F.Supp. 980, 987–88 (S.D.N.Y.1982) *rev'd on other grounds, Rivera v. Coombe*, 683 F.2d 697 (2d Cir.1982). Here, after hearing the (live) testimony of the Master and Chief Mate, among others, the Majority chose to credit their testimony and found their version of events—*i.e.* that they did not know who caused the erasures; were not aware of the clogging in the deck lines until they were out at sea; and were not made aware of the waxy, high pour nature of the cargo—to be credible. (Decision and Award at 6–9.) The Majority, as trier of fact, was not required to draw an adverse inference from the log entries and/or to discredit the testimony of vessel personnel. *See Rivera*, 534 F.Supp. at 987–88.

Third, the Award clearly demonstrates that the Majority reached its decision after reviewing all the evidence. Over the course of six hearings, the Majority considered an extensive range of evidence and had the opportunity to assess the demeanor and credibility of all the witnesses. *See California v. Green* 399 U.S. 149, 181, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (reminding that a personal examination and cross-examination of a witness allows him "to stand face to face with the [triers of fact] that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief"). The Majority carefully considered—and was most persuaded by—the convincing evidence contained in Adam's shore tank analytical reports which showed that the cargo was loaded in the Bahamas at 115 F. or 20 degrees below its required temperature (which was 135 F.). (Decision and Award at 6.) The evidence also showed that heating of the oil was stopped in two of the shore tanks in which the cargo was held in the Bahamas. (Decision and Award at 11.) The Majority considered this evidence in conjunction with other data indicating that, due to the high wax content of the cargo, the LSWR fuel should have been heated to 135 F. or 30 degrees above the cargo's pour point in order for it to flow through vessel's deck lines and then drain by gravity into the cargo tanks. (Decision and Award at 13.) The totality of this evidence led the Majority to conclude that Adam's failure—before the vessel left the Bahamas—properly to heat and load the cargo led to the ultimate clogging of the deck lines. (Decision and Award at 13.) What Adam believed may have occurred at sea—including events which may have been reflected in the log erasures—was conjecture, was never proven, and could not alter the Majority's conclusion. There is no basis to overturn their findings.[6]

---

6. The Majority also concluded that (i) Adam knew about the high pour point and high wax content of the cargo but failed to convey this information to vessel personnel; (Decision and Award at 11–12); and (ii) whether or not vessel personnel knew (*i.e.* independently) of the LSWR content of the cargo and its high pour point, Adam as Charterer had a commercial and legal obligation to inform Page and the vessel's personnel of the cargo's spe-

Finally, the Majority considered the issue of "superseding cause and avoidable consequences" and, in particular, whether any intervening force "brought about harm different in kind from that which would otherwise have resulted from the actor's [Adam's] negligence." *See Restatement (Second) of Torts* § 442(a). Adam argued that, despite the low loading temperature of the cargo, Page should, thereafter, have taken steps to avoid the consequences of Adam's negligence by draining the deck line or by not throttling or closing cargo valves. (Decision and Award at 13.) The Majority rejected the idea that any intervening events brought about a harm different in kind than would otherwise have occurred. (Decision and Award at 14.) As noted, the Majority found that because the fuel was loaded at a temperature which was too cold vis-a-vis its pour point "no amount of cargo heating on board, even if heating had started at the commencement of loading, would have had any impact on the blocked pipelines." (Decision and Award at 11.) The Majority further found that Page had no control over the loading rate or over the loading temperatures. (Decision and Award at 13.) **The Majority, therefore, concluded that even if Page were negligent in failing properly to drain the vessel's deck lines during the voyage, the fuel would, nevertheless, have congealed in the deck lines, causing extensive damage to Page in offloading the fuel.** (Decision and Award at 14.)

### IV. ATTORNEY'S FEES

Clause 23 of the charter party agreement between Page and Adam states that "[d]amages for breach of this Charter shall include all provable damages, and all costs of suit and attorney fees incurred in any action thereunder." Courts construing language almost identical to Clause 23 have awarded court costs and reasonable attorneys' fees to the prevailing party in arbitration award confirmation proceedings such as the instant matter. *See Elite, Inc. v. Texaco Panama Inc.*, 777 F.Supp.

289, 292 (S.D.N.Y.1991) ("The language of the charter clearly supports [the claim of the party seeking confirmation] that attorneys' fees and costs are recoverable with respect to any action arising under that agreement."); *Trans–Asiatic Oil Ltd. S.A. v. UCO Marine Int'l Ltd.*, 618 F.Supp. 132, 137 (S.D.N.Y.1985) (awarding all court costs and reasonable attorneys' fees to the party seeking confirmation of an arbitral award). Thus, the Court here determines that it is appropriate to award costs and reasonable attorneys' fees incurred by Page in this confirmation proceeding against Adam and directs Page to serve and file documentation supporting such costs and reasonable attorney's fees on or before May 25, 1999.

### Conclusion and Order

The Court finds that the Majority engaged in lengthy and extensive review and analysis of the merits of the case and did not act in manifest disregard of law in reaching its decision. The motion to confirm the Award is granted and the motion to vacate the Award is denied. Costs and reasonable attorneys' fees for this proceeding are awarded to Page.

cial requirements and **failed to fulfill this** obligation. (Decision and Award at 12.)