OPINION OF THE COURT
Irving Lang, J.
Plaintiff’s motion for an order pursuant to CPLR 3217 (b) discontinuing this action without prejudice raises the issue whether adding a claim for damages to an application to enjoin a stock sale constitutes a waiver of the right to arbitrate.
I. FACTS
Plaintiff Bridas Sociedad Anónima Industrial y Comercial (hereinafter, Bridas), is an Argentine corporation. Defendant International Standard Electric Corporation (hereinafter, ISEC) is incorporated in Delaware and is a wholly owned subsidiary of ITT Corporation. On May 7,1979, Bridas and ISEC entered into *670 an agreement whereby Bridas purchased from ISEC 25% of the stock of an Argentine telephone company, Compañía Standard Electric Argentina S.A.I.C. (hereinafter, CSEA). Bridas and ISEC also entered into a shareholders’ agreement, in which they secured their reciprocal rights and obligations as sole shareholders of CSEA.[1] The shareholders’ agreement contains a broad arbitration clause, providing that: “all disputes connected to this agreement * * * shall be settled or finally decided by one or more arbitrators appointed by the International Chamber of Commerce in accordance with the rules of Conciliation and Arbitration.” The shareholders’ agreement and stock transfer were negotiated in New York City and Argentina.
Between 1979 and 1985, representatives of both ISEC and its parent company, ITT Corporation, made numerous trips to Argentina in connection with the business activities and operations of CSEA. Despite this, CSEA incurred substantial losses.
On March 4, 1985, ISEC informed Bridas of its intention to sell all of its shares in CSEA to a group of entities including Siemans AG., a West German corporation. Bridas strenuously objected to the sale, on the ground that the transaction would violate the shareholders’ agreement.
Bridas learned that ISEC intended to consummate the sale of its CSEA holdings on March 15,1985 or shortly thereafter. In an attempt to enjoin the sale, Bridas applied to Special Term, Part II, by way of order to show cause (dated Mar. 15, 1985), for a temporary restraining order and preliminary injunction. The court denied the request for a TRO but scheduled a hearing for March 20, 1985 on the preliminary injunction application.
On March 18, 1985, Bridas served ISEC with the order to show cause. Annexed to the affidavit were Bridas’ summons and *671 complaint. In addition to injunctive relief, damages were sought arising from ISEC’s purported breach of the shareholders’ agreement and breach of fiduciary duties. Upon receiving these papers, attorneys for ISEC informed counsel for Bridas that the sale of stock which Bridas sought to enjoin had already taken place on March 14, 1985. Consequently, ISEC requested that Bridas discontinue the action and withdraw its application for a preliminary injunction.
On March 19,1985, ISEC served its answer and notice to take depositions and produce documents. Bridas agreed to adjourn the hearing date on its motion for a preliminary injunction from March 20th to March 22nd, 1985, in order to examine certain papers with respect to ISEC’s representation that its stock in CSEA had already been sold.
On March 21,1985, new attorneys for ISEC contacted Bridas’ counsel to inform Bridas of the substitution of counsel. At that time, Bridas informed ISEC that, in view of the evidence indicating that the sale of ISEC’s shares had been effected, Bridas would withdraw its now-mooted motion for injunctive relief.
During the next several days, the parties attempted to stipulate to the conditions under which Bridas would discontinue the action. Bridas desires to discontinue the action without prejudice to any of its claims against ISEC. In contrast, ISEC would only consent to Bridas’ discontinuing the action without prejudice with the following proviso: if Bridas wanted to renew any claim for damages under the shareholders’ agreement, it could only do so in this forum, with ISEC retaining its priority of discovery. Under this condition, Bridas would be precluded from invoking the arbitration clause in the agreement.
Inasmuch as the parties were unable to stipulate, Bridas brought the present motion for an order discontinuing the action without prejudice. ISEC has filed a cross motion for an order determining that Bridas has waived its arbitration rights under the shareholders’ agreement by virtue of having commenced litigation in this forum.
II. WAIVER
The waiver question requires analysis of three underlying issues:
(1) Should the question of waiver be decided according to New York State law or the United States Arbitration Act (9 USC § 1 et seq.)l
(2) Is it within the province of the courts or the arbitrator to decide whether the right to arbitration has been waived?
*672 (3) Pursuant to the applicable body of law, what constitutes a waiver?
III. FEDERAL LAW V NEW YORK LAW
A) Contentions
The threshold choice of law problem requires determining whether the shareholders’ agreement evidences a transaction involving “commerce”, within the purview of the Federal Arbitration Act.
Bridas argues that the shareholders’ agreement reflects foreign commerce, thereby rendering the United States Arbitration Act and Federal law applicable to the question of waiver. It claims that the agreement is inextricably tied to the actual sale of stock between American and Argentine Corporations, that it spells out the rights and obligations of CSEA’s sole owners, and that it was designed to facilitate the smooth operation of CSEA.
In contrast, ISEC contends that the shareholders’ agreement simply speaks of notice, and not commerce, and that therefore the issue of waiver is governed by State arbitration law. It argues that the shareholders’ agreement is separate and distinct from the sales document, that it does not in any way govern the operations of CSEA, and that it does not provide for the shipment of goods across foreign borders. ISEC further claims that New York is the proper forum for this action, since the relevant transaction occurred here, the witnesses to the claimed breaches are located here, and an answer and discovery demand have been served in this action.
B) Analysis
The United States Arbitration Act (9 USC § 1 et seq.) makes enforceable all arbitration agreements concerning transactions involving commerce. The statute reverses centuries of judicial hostility to arbitration agreements, and reflects a repudiation of the common-law view which considered irrevocable arbitration agreements as “ ‘ousting’ the courts of jurisdiction”. (Scherk v Alberto Culver Co., 417 US 506, 510, n 4 [1974]; Southland Corp. v Keating, 465 US 1 [1984].) The Act was intended to allow parties to avoid the costliness of litigation and to place arbitration agreements on the same footing as other contracts. (Scherk v Alberto Culver Co., supra, at p 511.)
It provides in relevant part: “A written provision in any * * * transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter aris *673 ing out of such contract or transaction * * * shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.” (9 USC § 2; emphasis added.) Commerce is defined in section 1 simply as “commerce among the several States or with foreign nations”.
When an arbitration agreement is governed by the Federal Arbitration Act, certain rules apply. Specifically, Federal law, as opposed to State arbitration law, governs all questions of interpretation, construction, validity, revocability and enforceability. (Coenen v Pressprich & Co., 453 F2d 1209 [2d Cir 1972], cert denied 406 US 949 [1972]; Matter of Aaacon Auto Transp., 77 Misc 2d 1069 [1974]; Shearson Hayden Stone v Liang, 493 F Supp 104 [ND Ill 1980], affd 653 F2d 310 [7th Cir 1981]; Aerojet-General Corp. v Non-Ferrous Metal Refining, 37 AD2d 531 [1st Dept 1971].) Federal law also controls the allocation of functions between the court and the arbitrator. (Matter of Cone Mills Corp., 90 AD2d 31 [1st Dept 1982].) The applicability of the Federal Arbitration Act is not affected or diluted by the fact that the agreement specifies otherwise. “ ‘Even though the * * * agreement provides that it be governed by New York law, New York courts, in dealing with arbitration disputes where the contract involves * * * commerce, apply federal, and not state, arbitration law.’ ” (Masthead Mac Drilling Corp. v Fleck, 549 F Supp 854, 856 [SDNY 1982], citing Rothberg v Loeb, Rhoades & Co., 445 F Supp 1336 [SDNY 1978].)[2]
If, on the other hand, a contract is not predicated on interstate or foreign commerce, then State arbitration law controls. (Shearson Hayden Stone v Liang, supra; Aerojet-General Corp. v Non-Ferrous Metal Refining, supra.)
The House Report accompanying the Federal Arbitration Act suggests that the Legislature intended the term “commerce” to be broadly construed. The House Report states that “[t]he control over interstate commerce reaches not only the actual physical interstate shipment of goods but also contracts relating to interstate commerce”. (HR Rep No. 96, 68th Cong, 1st Sess 1 [1924]; emphasis added; Prima Paint v Flood & Conklin, 388 US 395, 401, n 7 [1967]; Coenen v Pressprich & Co., supra, atp 1212; Southland Corp. v Keating, supra.) Examination of the varied instances in which courts have found “commerce” to exist is instructive. In Fairchild & Co. v Richmond, Fredericksburg & *674 Potomac R.R. Co. (516 F Supp 1305 [US Dist Ct, DC 1981]) the court held that a leasing agreement which was designed to facilitate the development of an extensive commercial venture with potential consumer markets in Washington, Virginia and Maryland, involved “commerce” within the meaning of the Federal Arbitration Act. In Scherk v Alberto Culver Co. (supra), the United States Supreme Court found that “commerce * * * with foreign nations” (9 USC § 1) existed when Alberto Culver, a Delaware corporation, entered into a contract with a German citizen for the transfer of ownership of German and Lichtenstein enterprises to Alberto Culver, in order that the latter expand its overseas operations. In Prima Paint v Flood & Conklin (supra), a New Jersey corporation sold its paint business (which served more than 150 clients in several States) to a Maryland corporation. Shortly thereafter, the parties entered into a consulting agreement which provided that respondent assist in transferring the manufacturing and selling operations from New Jersey to Maryland. The consulting agreement contained an arbitration clause. The court held that inasmuch as the consulting agreement was “inextricably tied to [the] interstate transfer and to the continuing operations of an interstate manufacturing and wholesaling business” the contract evidences a transaction in interstate commerce within 9 USC § 1. (388 US, at p 401; see also, Weight Watchers of Quebec v Weight Watchers Intl., 398 F Supp 1057 [EDNY 1975]; Matter of Cone Mills Corp., supra; Masthead Mac Drilling Corp. v Fleck, supra; Coenen v Pressprich & Co., supra; Matter of Aaacon Auto Transp., supra.)
The controlling principle which emerges is that the United States Arbitration Act and Federal law govern where contractual activity facilitates, affects, or arises out of interstate or foreign commerce. Applying this rationale, I hold that the present dispute between ISEC and Bridas clearly arises out of a transaction involving foreign commerce. In my view the shareholders’ agreement (which was allegedly breached by ISEC) is inextricably intertwined to the $7.5 million sale of stock in one Argentine corporation (CSEA) by an American corporation (ISEC) to another Argentine corporation (Bridas). To this extent, the case is analogous to Prima Paints v Flood & Conklin (supra) where the consulting agreement was found to be tied to the interstate transfer of business operations.
Moreover, the first page of the shareholders’ agreement suggests that it invokes foreign commerce, inasmuch as it expresses the parties’ wish to provide for “adequate operation and growth” of CSEA. Paragraph 3 of the agreement specifies in detail the method of electing the board of directors of CSEA. Paragraph 4 *675 addresses the procedures to be followed in the event that ISEC sought to organize additional commercial ventures in Argentina. Paragraph 5 explains the manner of payment of dividends. The agreement also confirms that ISEC will “assure the continuing flow of know-how, technical assistance and other technology” from ISEC to CSEA. It further sets forth the rights of either Bridas or ISEC to transfer its shares in CSEA to any of its respective affiliates. The agreement also gives Bridas the option of purchasing additional shares of CSEA stock from ISEC under certain conditions.
Thus, ISEC’s claim that the shareholders’ agreement talks essentially about notice, as opposed to commerce, is belied by the agreement’s own terms.[3] The obvious thrust of the agreement is to insure successful operation of Argentine-based CSEA, while simultaneously protecting the interests of the American and Argentinian owners. The agreement’s “foreign commerce” purpose, import, and flavor is readily apparent. Accordingly, I hold that the shareholders’ agreement falls within the purview of the Federal Arbitration Act, and that Federal law governs the issue of whether Bridas has waived its right to arbitrate.
IV. UNDER THE UNITED STATES ARBITRATION ACT SHOULD THE COURT OR THE ARBITRATOR DETERMINE THE ISSUE OF WAIVER?
A division of opinion exists as to the proper forum to determine waiver of arbitration rights. Some courts have held that *676 the issue must be determined by an arbitrator. (World Brilliance Corp. v Bethlehem Steel Co., 342 F2d 362 [2d Cir 1965]; Matter of Cone Mills Corp., supra.) Others have taken the position that “where * * * the issue of waiver turns on the significance of actions taken in a judicial forum, the issue is one for the court, rather than the arbitrator, to decide.” (Weight Watchers of Quebec v Weight Watchers Intl., supra, at p 1059; Matter of Tsakalotos Nav. Corp., 259 F Supp 210, 213 [SDNY 1966]; see also, Masthead Mac Drilling Corp. v Fleck, supra; Lubrizol Intl. S. A. v M/V Stolt Argobay, 562 F Supp 565 [SDNY 1982]; Liggett & Myers v Bloomfield, 380 F Supp 1044 [SDNY 1974]; American Dairy Queen Corp. v Tantillo, 536 F Supp 718 [MD La 1982].)
The latter position is persuasive. Logic would dictate that, where examination of the degree of a party’s participation in a court action is the key to the waiver issue, the ultimate determination lies properly within the province of the court.
I therefore find that the question of waiver may be resolved in this forum.
V. WAIVER OF RIGHT TO ARBITRATE UNDER FEDERAL LAW
There exists an overriding Federal policy favoring arbitration, and a waiver of the right to arbitrate is not lightly inferred. (Southland Corp. v Keating, 465 US 1, supra; Masthead Mac Drilling Corp. v Fleck, 549 F Supp 854, supra; Lubrizol Intl. S. A. v M/V Stolt Argobay, supra; Weight Watchers of Quebec v Weight Watchers Intl., supra.) A mere delay in seeking a stay of the proceedings without some resultant prejudice to a party is insufficient for a finding of waiver. (Carcich v Rederi A/B Nor-die, 389 F2d 692,696 [2d Cir 1968].) “The factors upon which the waiver question appears to have turned most frequently against the party seeking to compel arbitration are [1] his dilatory conduct in seeking arbitration * * * coupled with his gaining of an undue advantage in the judicial forum or [2] other substantial prejudice to the opposing party, or [3] any other actions taken by the moving party which are sufficiently inconsistent with his seeking arbitration.” (Weight Watchers of Quebec v Weight Watchers Intl., supra, at p 1059; see also, American Dairy Queen Corp. v Tantillo, supra; Commercial Metals Co. v International Union Mar. Corp., 294 F Supp 570 [SDNY 1968]; ITT World Communications v Communications Workers of Am., 422 F2d 77 [2d Cir 1970].) The burden is heavy on the party seeking to prove that another’s right to arbitration has been waived (Lubrizol Intl. S. A. v M/V Stolt Argobay, supra; see also, Graig Shipping Co. v Midland Overseas Shipping Corp., 259 F Supp 929, 931 [SDNY 1966]; Demsey & Assoc. v S. S. Sea Star, 461 *677 F2d 1009, 1018 [2d Cir 1972]; Kulukundis Shipping Co. v Amtorg Trading Corp., 126 F2d 978 [2d Cir 1942]; Weight Watchers of Quebec v Weight Watchers Inti., supra).
It is only when substantial prejudice has resulted from resort to the courts will waiver be found.
Apart from extreme instances where prejudice is manifest, courts are reluctant to find a waiver of arbitration rights. Thus, in Masthead Mac Drilling Corp. v Fleck (supra), no waiver was found even though defendants previously brought an action in New York Supreme Court, since no substantial expenses had been incurred in the State court litigation. In ITT World Communications v Communication Workers of Am. (supra,), where defendant union filed an answer in a judicial proceeding and waited four months before seeking arbitration, no waiver existed, since plaintiff demonstrated no prejudice attributable to the delay.
A pivotal issue, therefore, is whether ISEC has sustained substantial prejudice by its participation in this action. I find that ISEC has failed to demonstrate the requisite element of prejudice. Bridas served its order to show cause on ISEC on March 18,1985, in an attempt to prevent the sale of stock which it believed to be in violation of the shareholders’ agreement. Only three days later, upon learning that the sale had been consummated Bridas indicated to ISEC’s attorneys that it wished to discontinue the action. Bridas filed its motion to discontinue on March 27.
In my view, when Bridas filed the order to show cause, it merely sought to preserve the status quo with respect to its rights as minority shareholder of CSEA, and was not acting inconsistently with its right to arbitrate. This is particularly so, since Bridas immediately attempted to withdraw the action once it was established that the act sought to be enjoined had already taken place.
The inclusion by Bridas in the complaint of two additional claims for an unspecified amount of damages does not vitiate Bridas’ arbitration rights, since ISEC has failed to demonstrate any prejudice due to the assertion of those claims. While the addition of the damage claims was perhaps a tactical blunder by Bridas (which was then pounced upon by ISEC to defeat plaintiff’s arbitration rights), justice is not served by a court’s embracing a strategic flaw to dispose of crucial issues.
ISEC’s argument that waiver should be found due to the considerable time and expense allegedly incurred in defending this action and filing the cross motion is unsupported and *678 unpersuasive especially in light of the case’s brief three-day life span. ISEC further claims that, by being named as a defendant in an Argentine lawsuit brought on behalf of CSEA by two Bridas’ appointed directors, it will waste time and money and suffer the type of prejudice which compels a finding of waiver. I simply note that the commencement of an Argentine-based lawsuit has little, if any, relevance to the seminal question whether ISEC sustained substantial prejudice due to the three-day action brought in this forum.
It is also significant that there has been absolutely no discovery exchanged in this proceeding. There is thus no possibility that Bridas gained any unfair advantage utilizing judicial discovery mechanisms which would otherwise be unavailable.
In sum, when interpreting the Federal Arbitration Act, courts have refused to find a waiver in the absence of substantial prejudice, notwithstanding that actions had lasted for several months, and pleadings and motions had been filed. In accord with the prevailing Federal case law, I find that ISEC has not met its burden of demonstrating substantial prejudice necessary to a finding of waiver.
Finally, even under New York State law, defendant ISEC cannot prevail. While some appellate courts have taken a more restrictive position (i.e., Matter of Spirs Trading Co. v Occidental Yarns, 73 AD2d 542 [1979]; Esquire Indus. v East Bay Textiles, 68 AD2d 845 [1st Dept 1979]; Hadjioannou v Avramides, 40 NY2d 929 [1976]; Young v Crescent, 240 NY 244), the sounder view is that significant judicial action usually must have occurred before a waiver will be found. (Denihan v Denihan, 34 NY2d 307; cf. De Sapio v Kohlmeyer, 35 NY2d 402.) Indeed, the latest pronouncement from the New York Court of Appeals accentuates this doctrine. In Sherrill v Grayco Bldrs. (64 NY2d 261 [1985]), the court found that defendant waived its right to arbitrate only after it had engaged in three years of litigation before serving arbitration demands, pursued litigation after the demands were served, asserted 15 cross claims and counterclaims and exchanged over 100,000 documents during the course of discovery. Significantly, the Sherrill court stated that “[n]ot every foray into the courthouse effects a waiver of the right to arbitrate * * * [W]here urgent need to preserve the status quo requires some immediate action which cannot await the appointment of arbitrators, waiver will not occur where plaintiff ‘moves in court for protective relief in order to preserve the status quo while at the same time exercising its right under the contract to demand arbitration’ ”. (64 NY2d, at p 273.)
*679 The extent to which Bridas resorted to judicial relief (a three-day lawsuit which was quickly sought to be withdrawn upon becoming moot) stands in marked contrast to the degree of participation in court proceedings evaluated in Sherrill v Grayco Bldrs. (supra). The order to show cause filed by Bridas was in the nature of protective relief — precisely the type of relief which the Court of Appeals views as consistent with preserving the right to arbitrate. Accordingly, even under New York law, I find that Bridas, by instituting the instant action for a preliminary injunction, has not lost its right to arbitrate claims against ISEC.
CONCLUSION
Bridas’ motion for an order discontinuing this action without prejudice is granted. ISEC’s cross motion for an order determining that Bridas has waived its right to arbitrate under the shareholders’ agreement is in all respects denied.

. The shareholders’ agreement provides, inter alla, that the controlling shareholder shall give notice to the minority shareholder in the event that the controlling shareholder decided to sell any of its shares in the corporation.
“The minority shareholder shall be entitled to advise the controlling shareholder within 15 days from the date when said notice was received * * * that it opposes such sale on the grounds that the prospective buyer * * * is of unsatisfactory reputation in the Argentine community or has a substantial and outstanding conflict of interest * * * with the minority shareholder. In the event of such opposition, the controlling shareholder shall refrain from carrying out such sale.
“In the event that the controlling shareholder decides to sell a sufficient number of its shares in the corporation which would reduce its shareholdings to less than 50% of the outstanding shares in the corporation * * * then the minority stockholder shall be given an opportunity to sell its shares on the same terms and conditions and in the same proportion as the controlling shareholder”.

. The instant shareholders’ agreement provides in paragraph 8 that it “shall be governed by and construed under and in accordance with the laws of the State of New York”. That clause merely means that the arbitrators are to be guided by New York law in their decision.

. I reject ISEC’s argument that the shareholders’ agreement here is akin to the agreement in Bernhardt v Polygraphic Co. (350 US 198 [1956]). In Bernhardt, petitioner brought suit for damages against respondent New York corporation for alleged breach of an employment contract. At the time the contract was executed, petitioner was a New York resident. He later moved to Vermont, where he was to perform his duties under the contract. The contract provided that the parties would submit any dispute to arbitration in New York and would abide by New York law. On the question of whether “commerce” was present within the meaning of the Federal Arbitration Act, the court held that “[t]here is no showing that petitioner while performing his duties under the employment contract was working in commerce, was producing goods for commerce, or was engaging in activity that affected commerce, within the meaning of our decisions.” (350 US, at pp 200-201.) The distinctions between the instant case and Bernhardt are obvious. This case involves an agreement based upon a multimillion dollar transfer of stock between an American and Argentine corporation; the agreement provides for the continuous infusion by ISEC of technological assistance into CSEA for the commercial benefit of both Bridas and ISEC, and it establishes the rights and obligations of the shareholders with respect to the operations of CSEA. Bernhardt simply involved an allegation by a Vermont employee that a New York corporation breached his employment contract. The two cases are inapposite; ISEC’s argument that Bernhardt supports the claim that foreign commerce does not exist here is unpersuasive.