**INTERNATIONAL STANDARD ELECTRIC CORPORATION,**
Petitioner,

v.

**BRIDAS SOCIEDAD ANONIMA PETROLERA, INDUSTRIAL Y COMERCIAL, Respondent.**

No. 90 Civ. 0720 (KC).

United States District Court,
S.D. New York.

Aug. 24, 1990.

Edwin A. Kilburn and Roger W. Langsdorf, New York City, David J. Branson, Tracey E. Aronson, Peter C. Condron, Kaye, Scholer, Fierman, Hays & Handler, Washington, D.C., for petitioner.

Jerry Lawrence Siegel and Sergio Le Pera, Le Pera & Lessa, New York City, Leandro N. Alem, Buenos Aires 1001 Argentina, for respondent.

## OPINION and ORDER

CONBOY, District Judge:

In this action, the parties seek, on the one side, to vacate a foreign arbitration award, and, on the other, to enforce that award pursuant to an international convention. This case, then, requires us to evaluate and apply the relevant standards for *vacatur* and enforcement of an award made under the aegis of the International Chamber of Commerce Court of Arbitration in Paris.

## BACKGROUND

Petitioner, International Standard Electric Corporation ("ISEC"), is a wholly owned subsidiary of the International Telephone and Telegraph Company ("ITT"). Respondent Bridas Sociedad Anonima Petrolera, Industrial Y Comercial ("Bridas") is a corporation organized and doing business in Argentina. At issue in this case is the interpretation of certain provisions of the United Nations Convention on Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention" or the "Convention"), signed in New York City on June 10, 1958, 3 U.S.T. 2517, T.I. A.S. No. 6997, 330 U.N.T.S. 38, and implemented after United States ratification in 1970 at 9 U.S.C.A. §§ 201 *et seq.* (West Supp.1990).

A brief preliminary account of events leading to this lawsuit is, at this point, essential, which account is primarily distilled from the arbitral record of this case. By the late 1970's, the American corporation ITT had established itself as a global pace setter in the telecommunications industry. It conducted its international business through ISEC, which was its wholly owned subsidiary. ISEC in turn controlled more than 50% of the Argentine telecom-

munications market through its wholly owned subsidiary, Compania Standard Electric Argentina S.A. ("CSEA"). In 1978, ISEC offered, and Bridas accepted 25% participation in CSEA for $7.5 million. The parties entered into a Shareholders Agreement (the "Agreement") (Ex. G, Bridas' Notice of Motion, dated March 21, 1990, hereinafter "Bridas Notice") on May 7, 1979 to control the terms of their arrangement. Chapter 11 of the Agreement provides that "[a]ll disputes connected to this Agreement ... shall be settled or finally decided by one or more arbitrators appointed by the International Chamber of Commerce in accordance with the Rules of Conciliation and Arbitration." Chapter 8 of the Agreement provides that the Agreement would be "governed by and construed under and in accordance with the laws of the State of New York."

On April 17, 1985 Bridas filed with the International Chamber of Commerce ("ICC") in Paris a Request for Arbitration and Summary of Complaint, and nominated as a member of the Arbitral Panel Dr. Eduardo Jimenez de Ariechaga of Uruguay, former President of the International Court of Justice at the Hague. ISEC sought to block the arbitration by applying for injunctive relief in the New York State Supreme Court, which relief was denied on June 11, 1985. *See Bridas S.A.P.I.C. v. International Standard Electric Corp.,* 128 Misc.2d 669, 490 N.Y.S.2d 711 (Sup.Ct. N.Y.Cty.1985). In July of 1985, ISEC nominated as a member of the Arbitral Panel Edward Hidalgo, Esq. of the United States, a practicing attorney and former Secretary of the Navy in the Administration of President Carter. On September 25, 1985, the ICC International Court of Arbitration designated as the third and presiding member of the Arbitral Panel Lic. Manuel Lizardi Albarran of Mexico. Mexico City was designated as the place of the arbitration, and pursuant to Article 9(2) of the ICC Rules, each party was directed to pay one half of the ICC advance on costs of $190,000.

On February 27, 1986, the Appellate Division of the New York State Supreme Court unanimously affirmed the denial of ISEC's attempt to enjoin the arbitration.

117 A.D.2d 1027, 499 N.Y.S.2d 566 (1st Dep't 1986). On July 24, 1986, ISEC filed "Objections to Jurisdiction" with the Arbitral Panel, asserting lack of jurisdiction over three of the four claims set forth in Bridas' complaint. On August 19 and 20, 1986, the Arbitral Panel conducted a hearing in Mexico City, heard argument on the jurisdictional question, and in conjunction with the parties drafted the Terms of Reference, which were then signed by the parties. These terms defined the issues to be decided. The Panel also established a schedule for the submission of briefs on the jurisdictional question.

Shortly after both parties had submitted their briefs on that matter, the ICC International Court of Arbitration, on November 7, 1986, suspended the arbitral proceedings because of ISEC's refusal to pay its half of the ICC advance on costs. On February 17, 1987, Bridas filed suit against ISEC in New York State Supreme Court to compel ISEC to comply with its costs obligations under the Rules. Four months later, Bridas posted a letter of credit with the ICC guaranteeing payment of ISEC's share of the costs, and the suspension on the proceedings was lifted.

On September 1, 1987, the Panel held a hearing and heard oral argument on the jurisdictional issues, and shortly thereafter, on October 22, 1987 issued a "Preliminary Award on Jurisdiction," concluding that the relevant clause is "sufficiently broad to comprehend the particular dispute now before it and to permit it to proceed to a full consideration of the merits of such dispute...." Bridas Notice, Exhibit F, ¶ 8. On December 18, 1987, ISEC filed its Answer to the Complaint, and on March 15, 1988, the Panel issued a schedule for submissions of evidence, expert opinions and memoranda of law. On nine separate dates from June 6, 1988 through November 28, 1988 the parties filed a daunting volume of material with the Panel, including affidavits from no less than seven experts.

On December 8–10, 1988, the Panel met and announced its intention to appoint an independent expert in New York corporate and contract law to advise it, pursuant to

Article 14(2) of the ICC Rules. It declined to advise the parties of the identity of the expert selected. The Record demonstrates that Bridas objected in the most vociferous and comprehensive terms to this procedure. In contrast, ISEC merely expressed concern lest the proposed expert have a possible conflict of interest in the relevant sector of legal practice. The Panel assured ISEC in writing that the expert had no legal practice, but was rather a law professor in New York. ISEC said no more, and proceeded to promptly pay its share of the expert's fee. This remains the only portion of its fair share of the costs that ISEC has paid.

On January 16, 1989, at the request of the Panel, each party filed the full text of all authorities, including cases, statutes, rules and all other sources, upon which it relied. The material submitted by ISEC contained no reference to the aforementioned court expert selection procedure. Nor was any reference made to it by ISEC either in the final hearing before the Panel in Mexico City on March 30–31, 1989 or in the final Reply Memorandum and Exhibits filed by ISEC with the Panel on April 25, 1990.

On December 20, 1989, the Panel, in accordance with the rules which require the advance review and approval by the ICC International Court of Arbitration, signed the final Award, which was released and issued to the parties on January 16, 1990.

The Arbitral Award ("Award") (Bridas Notice, Ex. A.), found unanimously by the Panel, concluded that Bridas had not established that ISEC had made misrepresentations or committed fraud in connection with the sale of certain stock to Bridas in 1979 (Award at 17); that Bridas had not established that ISEC had unlawfully mismanaged CSEA (Award at 18); that Bridas had established that in July of 1984 ISEC breached its fiduciary obligations to Bridas in connection with a 1984 recapitalization of CSEA (Award at 19–20); and that Bridas had established that in March of 1985 ISEC breached its contractual and fiduciary obligations to Bridas by selling, over Bridas' objection, its 97% interest in CSEA to Sie-

mens, the German multinational corporation and a major competitor of Bridas in Argentina. The Panel also concluded that ISEC had failed to "comply with the norms of good faith demanded of a fiduciary" by not giving Bridas adequate notice of the proposed sale and its terms (Award at 21–24). Though describing these findings against ISEC as erroneous, ISEC concedes that they are beyond this Court's review. Memorandum of Law in Support of ISEC's Petition to Vacate and in Opposition to Bridas' Cross–Petition to Enforce Arbitration Award, dated April 27, 1990 ("ISEC Mem."), at 5, 7. The Panel awarded Bridas damages of $6,793,000 with interest at 12%, compounded annually, from March 14, 1985. Bridas was also granted $1 million in legal fees and expenses plus $400,000 for the costs of the arbitration.

On February 2, 1990, ISEC filed a petition in this Court to vacate and refuse recognition and enforcement of the Award. Respondent Bridas has cross-petitioned to dismiss ISEC's petition to vacate on the grounds that this Court lacks subject matter jurisdiction to grant such relief under the Convention, and for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(1) and (6). Bridas further cross-petitions to enforce the Award pursuant to Article III of the Convention.

## ANALYSIS

We will first address the question of whether, under the binding terms of the New York Convention, we lack subject matter jurisdiction to vacate a foreign arbitral award. The situs of the Award in this case was Mexico City, a location chosen by the ICC Court of Arbitration pursuant to rules of procedure explicitly agreed to by the parties. Since the parties here are an American Company and an Argentine Company, it is not difficult to understand why the Mexican capital was selected as the place to conduct the arbitration.

■ Bridas argues that, under the New York Convention, only the courts of the place of arbitration, in this case the Courts of Mexico, have jurisdiction to vacate or set aside an arbitral award. ISEC argues that

under the Convention both the courts of the place of arbitration and the courts of the place whose substantive law has been applied, in this case the courts of the United States, have jurisdiction to vacate or set aside an arbitral award.

Under Article V(1)(e) of the Convention, "an application for the setting aside or suspension of the award" can be made only to the courts or the "competent authority of the country in which, *or under the law of which*, that award was made." (Emphasis added). ISEC argues that "the competent authority of the country ... under the law of which [the] award was made," refers to the country the substantive law of which, as opposed to the procedural law of which, was applied by the arbitrators. Hence, ISEC insists that since the arbitrators applied substantive New York law, we have jurisdiction to vacate the award.

ISEC cites only one case to support this expansive reading of the Convention, *Laminoirs–Trefileries–Cableries de Lens v. Southwire Co.*, 484 F.Supp. 1063 (N.D.Ga. 1980). That case, however, did not involve a foreign award under the Convention, and did not implicate the jurisdictional question here raised, since there the parties' substantive and procedural choice of law, and the situs of the arbitration were both New York. It seems plain that the Convention does not address, contemplate or encompass a challenge to an award in the courts of the state where the award was rendered, since the relation of the courts to the arbitral proceedings is not an international, but a wholly domestic one, at least insofar as the Convention is concerned. Whether such an arbitration would be considered international because of the parties' nationalities under the Federal Arbitration Act, is irrelevant. *See* A. Van den Berg, *The New York Arbitration Convention of 1958* 19–20, 349–50 (Kluwer 1981).

Bridas has cited a case decided by our colleague Judge Keenan, *American Construction Machinery & Equipment Corp. v. Mechanised Construction of Pakistan Ltd.*, 659 F.Supp. 426 (S.D.N.Y.), *aff'd*, 828 F.2d 117 (2d Cir.1987), *cert. denied*, 484 U.S. 1064, 108 S.Ct. 1024, 98 L.Ed.2d 988 (1988), as authority against the ISEC position. This case involved a dispute between a Cayman Islands Company and a Pakistani company, arguably controlled by Pakistani substantive law and arbitrated in Geneva. Judge Keenan was asked to decline enforcement of the award on the ground that a challenge to it was pending in the courts of Pakistan. He ruled that "[t]he law under which this award was made was Swiss law because the award was rendered in Geneva pursuant to Geneva *procedural law*" 659 F.Supp. at 429 (emphasis added). This analysis was expressly affirmed in the Court of Appeals, and the Supreme Court declined to review it.

Our Circuit has set forth a brief history of the Convention in an enforcement, as distinguished from a jurisdictional, case under the Convention in *Parsons & Whittimore Overseas Co., Inc., v. Société Générale De L'Industrie Du Papier (RAKTA)*, 508 F.2d 969, 973 (2d Cir.1974), and in general terms has recognized that the basic thrust of the convention was to limit the broad attacks on foreign arbitral awards that had been authorized by the predecessor Geneva Convention of 1927, 92 League of Nations Treaty Ser. 2302.

The New York Court of Appeals, in an opinion by its Chief Judge, in a jurisdictional case involving pre-arbitration attachment under the Convention, asserted that the policy underlying the Convention, the avoidance of "the vagaries of foreign law for international traders" would be defeated by the allowance of multiple suits (there in New York, the home of one of the parties), where the parties have agreed, by contract, to place their dispute in the hands of an international arbitral panel in a neutral legal forum, (there Switzerland). *Cooper v. Ateliers De La Motobecane, S.A.*, 57 N.Y.2d 408, 410, 456 N.Y.S.2d 728, 729, 442 N.E.2d 1239, 1240 (1982).

In *Bergesen v. Joseph Muller Corp.*, 710 F.2d 928 (2d Cir.1983), the Court interpreted certain terms of the Convention in a case involving an award arising from an arbitration held in New York between two foreign entities. The court construed the United States position in the draft proceed-

ings leading to the adoption of the Convention as urging adoption of a territorial criterion on jurisdiction, this is, that the situs of the award, without regard to such factors as the nationality of the parties, the subject of the dispute and the rules of arbitral procedure, would determine if the award was "foreign" under the Convention. France and Germany, the Court pointed out, had on the other hand, urged that the nationality (that is, is the award foreign and therefore within the Convention, or domestic and therefore outside the Convention) of an award should be determined "by the law governing the procedure," 710 F.2d at 931. The Court noted that although an effort at compromise was made to restrict the territorial concept, the "final action by the convention appears to have had the opposite result, i.e., except as provided in paragraph 3, the first paragraph of Article I means that the convention applies to all arbitral awards rendered in the country other than the state of enforcement, whether or not such awards may be regarded as domestic in that state...." *Id.*

We conclude that the phrase in the Convention "[the country] under the laws of which that award was made" undoubtedly referenced the complex thicket of the *procedural* law of arbitration obtaining in the numerous and diverse jurisdictions of the dozens of nations in attendance at the time the Convention was being debated. Even today, over three decades after these debates were conducted, there are broad variations in the international community on how arbitrations are to be conducted and under what customs, rules, statutes or court decisions, that is, under what "competent authority." Indeed, some signatory nations have highly specialized arbitration procedures, as is the case with the United States, while many others have nothing beyond generalized civil practice to govern arbitration. *See* Lowenfeld, *The Two-Way Mirror: International Arbitration as Comparative Procedure*, 7 Mich.Y.B.Int'l Legal Studies 163, 166–70 (1985), *reprinted in* 2 Craig, Park and Paulssou, *International Chamber of Commerce Arbitration*, App. VII at 187 (1986).

This view is confirmed by Professor Van den Berg to the effect that the language in dispute reflects the delegates' practical insight that parties to an international arbitration might prefer to equalize travel distance and costs to witnesses by selecting as a situs forum A, midpoint between two cities or two continents, and submit themselves to a different procedural law by selecting the arbitration procedure of forum B.

> The "competent authority" as mentioned in Article V(1)(e) for entertaining the action of setting aside the award is virtually always the court of the country in which the award was made. The phrase "or under the law of which" the award was made refers to the theoretical case that on the basis of an agreement of the parties *the award is governed by an arbitration law which is different from the arbitration law of the country in which the award was made.*

A. Van den Berg, *The New York Arbitration Convention of 1958* 350 (Kluwer 1981) (emphasis added). This view is consistent with a commentary on the circumstances under which the Soviet delegate offered the amendment embracing the language in issue. *See* United Nations Conference on International Commercial Arbitration, Summary Record of the 23rd Meeting, 9 June 1958, E/CONF. 26/SR.23 at 12 (12 Sept. 1958), *reprinted in* G. Gaja, *International Commercial Arbitration: New York Convention* III C. 213 (Oceana Pub.1978).

It is clear, we believe, that any suggestion that a Court has jurisdiction to set aside a foreign award based upon the use of its domestic, substantive law in the foreign arbitration defies the logic both of the Convention debates and of the final text, and ignores the nature of the international arbitral system. This is demonstrated overwhelmingly by review of cases in foreign jurisdictions that have considered the question before us.

Decisions of foreign courts deciding cases under the Convention uniformly support the view that the clause in question means procedural and not substantive (i.e., in most cases contract) law. See the Affi-

davit of Professor George A. Bermann of Columbia Law School, sworn to June 18, 1990 at 22–29 ("Bermann Aff."), citing for this proposition and discussing rulings of the Supreme Court of India (*Oil and Natural Gas Commission v. The Western Company of North America*, decision of January 16, 1987, 12 Y.B.Com.Arb. 473 [1988]); the Brussels Court of Appeals (*S.A. Mines, Minérais et Métaux v. Mechema, Ltd.*, decision of October 14, 1980, 7 Y.B.Com.Arb. 316 [1982]); the Supreme Court of France (Cour de Cassation) (*Maatschappij voor Industriële Research en Ontwikkeling B.V. v. Henri Liévremont and M. Cominassi*, decision of May 25, 1983, 12 Y.B.Com.Arb. 480 [1987]); the West German Supreme Court (*Bundesgerichtshof*, decision of February 12, 1976, 2 Y.B.Com.Arb. 242 [1977]); the Spanish Supreme Court (Tribunal Supremo) (*Cominco France S.A. v. Soguiber S.L.*, decision of March 24, 1982, 8 Y.B.Com.Arb. 408 [1983]); and the Supreme Court of South Africa (*Laconian Maritime Enterprises Ltd. v. Agromai Lineas Ltd.*, decision of August 27, 1985, 14 Y.B.Com.Arb. 693 [1989]).

Finally, we should observe that the core of petitioner's argument, that a generalized supervisory interest of a state in the application of its domestic substantive law (in most arbitrations the law of contract) in a foreign proceeding, is wholly out of step with the universal concept of arbitration in all nations. The whole point of arbitration is that the merits of the dispute will *not* be reviewed in the courts, wherever they be located. Indeed, this principle is so deeply imbedded in American, and specifically, federal jurisprudence, that no further elaboration of the case law is necessary. That this was the animating principle of the Convention, that the Courts should review arbitrations for procedural regularity but resist inquiry into the substantive merits of awards, is clear from the notes on this subject by the Secretary–General of the United Nations. *See* Bermann Aff., *supra,* at 32–33.

Accordingly, we hold that the contested language in Article VI(e) of the Convention, "... the competent authority of the country under the law of which, [the]

award was made" refers exclusively to procedural and not substantive law, and more precisely, to the regimen or scheme of arbitral procedural law under which the arbitration was conducted, and not the substantive law of contract which was applied in the case.

In this case, the parties subjected themselves to the procedural law of Mexico. Hence, since the situs, or forum of the arbitration is Mexico, and the governing procedural law is that of Mexico, only the courts of Mexico have jurisdiction under the Convention to vacate the award. ISEC's petition to vacate the award is therefore dismissed.

We now turn to Bridas' cross-petition to enforce the award. ISEC apparently concedes, as it must, that this Court has jurisdiction under the Convention to enforce the Award, and that to avoid enforcement ISEC must establish one of the authorized defenses under Article V of the Convention. Unfortunately, ISEC's papers are insufficiently rigorous in structure, substance and argument to determine with precision what provisions of the Convention it is proceeding under in resisting enforcement of the Award.

We assume that ISEC is, in substance, asserting defenses under Article V(1)(b), in that it was unable to present its case because "the parties must be given the identity of the expert and the expert's opinion, as well as a meaningful opportunity to rebut that opinion", Supplemental Memorandum of Law In Support of ISEC's Petition to Vacate and Deny Enforcement of the Arbitral Award dated July 23, 1990 ("ISEC Supp.Mem.") at 1.; under Article V(1)(c) in that the Arbitral Panel decided matters beyond the scope of the submission to it, because the arbitrators "exceeded their authority by awarding damages based on equitable norms, rather than on law," ISEC Mem. at 28; and under Article V(2)(b) in that enforcement of the Award would be contrary to the public policy of the United States because "the secret procedures utilized by the arbitrators when they appointed an expert violated due process standards...." *Id.* at 11.

In connection with the first defense, an inability to present its case, ISEC asserts that its rights under the Convention were subverted by the panel's use of a "secret expert" in New York Law, ISEC Mem. at 11–28, and by the acceptance and presumed consideration by the panel of a brief in Spanish, on the question of the interest award, submitted out of time by Bridas, Affidavit of David Branson, Esq., sworn to April 25, 1990, at 9–12 ("Branson Aff.").

Following closure of the record and voluminous submissions by the parties, the panel sent a letter to counsel on December 14, 1988 advising of its interest in having four points of New York Law addressed at oral argument. The panel also announced its intention of appointing "an independent recognized expert on New York corporate and contract law," to advise on the four legal points identified. Branson Aff., Ex. 4. Bridas objected to the appointment, and did so in the clearest, most emphatic, and unequivocal terms. The record on this point is set forth in the Reply Memorandum of Law In Support of Bridas' (A) Motion to Dismiss ISEC's Petition to vacate and (B) Cross–Petition to Enforce the Arbitration Award ("Bridas Reply Mem."), at 27–30. These objections, which counsel for ISEC saw as they were submitted to the panel, explicitly complained of the failure to grant the parties access to the expert's credentials and report.

ISEC's counsel responded to the panel in a five sentence telex dated December 21, 1988, only the last sentence of which deals with the subject of the expert. This single, neutral and wholly uncritical sentence reads as follows: "Finally, I believe that the parties should be informed concerning the selection of the legal expert, his role and the issues to be put to him." Branson Aff., Ex. 5. It should be noted that no objection is raised to non-disclosure of the expert's name. It is clear on reading the text of the panel's response of December 29, 1988 to the Branson telex, that the panel did indeed inform ISEC on the selection, the role of and the issues to be addressed by the expert. Branson Aff., Ex. 7. On February 14, 1989, ISEC's counsel wrote to the panel, and advised as follows:

There is another point regarding the retention of the expert. ITT is the owner of hundreds of corporations. It is possible that a New York lawyer could be in a firm that has represented one of these subsidiaries but he/she might not be aware of its connection to ITT. Should one later be found to exist, it might jeopardize the award. If the parties are given the name of the expert, they could assure that no conflict exists. Of course, it goes without saying that neither party, directly or indirectly would have any contact with the expert or the firm.

Branson Aff., Ex. 10.

Now what does the plain meaning of this representation to the panel tell us? It tells us, of course, that ISEC accepts the panel's response to its telex as broadly satisfactory. Nowhere is the word secrecy mentioned, and certainly the grim shadow of star chamber is nowhere invoked, as indeed nowhere is an imminent traducing of American due process standards mentioned. What we have is a modest and helpful suggestion, an afterthought really, that the panel may wish to avert a wholly theoretical and speculative possibility that a conflict of interest might exist for the expert selected. No concern is expressed about nor demand made for access to the expert's report, his formal credentials, and most importantly, his role in the proceedings.

By letter of February 21, 1989, the panel advised the parties in response to the "suggestion" (an excellent choice of word, we believe) of ISEC on the conflict matter that it favored "the selection of a university professor, totally detached from any law firm." Branson Aff., Ex. 11.

This completely satisfied ISEC, in that it expressed itself no more on the matter. We further note, *although we in no way rely upon*, the fact that ISEC promptly remitted its portion of the expert's fee, in contrast to its shameless footdragging on paying its fair share of expenses associated with *every other aspect* of this long and expensive proceeding. Bridas Reply Mem. at 30–32.

We also find that having abandoned whatever objection to the expert that can be said to have been made in its telex of December 21, 1988, ISEC cannot now seek the refuge of its adversary's arguments when, during the heat of that engagement, it stood utterly silent on the merits of the matter, lent no voice or encouragement, and by tactics and tone sought to thereby ingratiate itself with the panel. We can, sadly, divine no other purpose, since counsel now insists that his profound, substantive objections to the process, unvoiced in the record, mirrored those of his opponent.

Such cleverness is the bane of judges the world over. This is what led Hamlet as he reflected on the scull of Yorick to mock the profession so cruelly. We understand our obligation not to allow a party to impeach on later review a decision of a trial judge, or as here, an arbitral panel, where that party had full opportunity to contest it, and full notice of the vigorous argument of an adversary contesting it, and chose instead not to associate himself with the argument, and not to contest the matter. We thus find as a fact that ISEC never objected to the consultation of an expert by the panel and never demanded access to his report.

■ Accordingly, we hold that no objection to the appointment procedure used in the selection and consultation of the expert on New York law was made, that any objections ISEC in fact had were waived, and ISEC will not now be heard to complain about it.

As Judge Weinfeld observed in *Hunt v. Mobil Oil Corp*, 654 F.Supp. 1487, 1518 (S.D.N.Y.1987):

> If this [objection] were upheld, it would mean seven years of arbitral activities of the parties, of their lawyers and the huge legal expenses incurred would go down the drain ... [a party cannot] wait in ambush and then render wasteful years of effort at an expenditure of millions of dollars. A party "cannot remain silent, raising no objection during the arbitration proceeding, and when an award adverse to him has been handed down complain. of the situation of which he had knowledge from the first," *Cook*

*Indus., Inc. v. Itoh & Co.,* [449 F.2d 106 (2d Cir.1971) ] [cite].

As our colleague Judge Duffy stated in *La Société Nationale pour La Récherche, La Production, Le Transport, La Transformation et La Commercialisation des Hydrocarbures v. Shaheen Natural Resources,* 585 F.Supp. 57, 62, 65 (S.D.N.Y. 1983), *aff'd,* 733 F.2d 260 (2d Cir.), *cert. denied,* 469 U.S. 883, 105 S.Ct. 251, 83 L.Ed.2d 188 (1984), a case in which he rejected asserted "procedural deficiencies" in an ICC arbitration as defenses to enforcement of a foreign arbitral award, the party resisting enforcement

> should have presented its objection to the arbitration panel.... To deny recognition and enforcement to the arbitration award ... at this stage would be to violate the goal and the purpose of the Convention, that is, the summary procedure to expedite the recognition and enforcement of arbitration awards. See *Imperial Ethiopian Government v. Baruch–Foster Corp.,* 535 F.2d [334] at 335 [ (5th Cir.1976) ].

ISEC asserts that the action by the panel constitutes (a) a violation of the due process standards of the United States; (b) a violation of the public policy of the United States; and (c) a violation of arbitration procedures under the Convention. Since we will not pass upon the appropriateness of the appointment of the legal expert for the reasons stated, these arguments are dismissed. Furthermore, the objection to the receipt by the panel of a memorandum of law from Bridas as out of time is dismissed as frivolous.

We turn now to the remaining defense under the Convention, the assertion by ISEC that the Award dealt with matters or decided differences beyond the scope of the parties' submission to arbitration. ISEC Petition, ¶¶ 17–19, 24. In its legal argument, however, ISEC has made a somewhat different claim, that "the arbitrators exceeded their authority and acted as *amiables compositeurs,* in that they awarded damages" based on equitable norms, rather than on law, ISEC Mem. at 28. This argu-

ment is based almost wholly upon one sentence quoted from the Award:

> All in all, the combined guidance of the relevant legal principles, applied in the context of the *equitable nature of the norms which govern our task,* lead us to conclude that Bridas is entitled to the "restitution" of its May 1979 investment of $7.5 million....

Award at 28–29 (emphasis added).

The Award further states, in the very next paragraph, which is not quoted in ISEC's brief:

> [a]lthough New York law awards interest of 9% for violations post 25 June 1981, it further stipulates that this statutory provision is not binding in actions of an equitable nature. CPLR sec. 5001. *See also, Branson & . Wallace, [Awarding Interest in International Commercial Arbitration Establishing a Uniform Approach,* 28 Va.J.Int'l L. 919 (1988)].* We exercise the discretion granted by law by establishing an interest rate of 12% *per annum,* annually compounded.

*Id.* at 29.

We note, parenthetically, that the co-author of the law review article cited by the Panel is ISEC's counsel in this case. We will not repeat here the extensive quotations from this article, in great measure at odds with the legal position taken by its author in this action, that fill his adversary's brief. Nor will we comment upon the barely restrained glee of counsel for Bridas in unearthing these nuggets. We observe only that the panel at least here relied upon a distinguished legal expert on the matter in issue.

ISEC disputes the factual findings of the arbitrators, ISEC Mem. at 29–31, in that "the damages that they awarded were neither foreseeable losses flowing from the breaches of fiduciary duty that they found, nor amounts necessary to put Bridas in the position it would have been in had the contract not been breached," *id.* at 28, and concludes that because they made the factual findings that they did, the arbitrators *ipso facto* acted as *amiables compositeurs, id.* at 31–36.

ISEC then quotes the ICC Rules to the effect that " 'the arbitrator shall assume the powers of an amiable compositeur if the parties are agreed to give him such powers,' " ISEC Mem. at 31 (quoting ICC Rules, Art. 13(4)). This *amiable compositeur* argument is a not especially elegant masque that seeks to conceal the fatal weakness of ISEC's defense: we are forbidden under the Convention to reconsider factual findings of the arbitral panel. Sensing this, ISEC once again transfers its argument to the more conventional, and usually unconvincing "manifest disregard of the law" complaint. ISEC Mem. at 37–40.

However, as ISEC's counsel concedes, ISEC Mem. at 37, the Convention, in Article V(2)(b), authorizes refusal of enforcement of an award only where "... enforcement would be contrary to the public policy of [the] country [where the award is to be enforced]." We observe that the Convention says nothing about "manifest disregard of the law."

Our colleague Judge Haight considered this question in *Brandeis Intsel Ltd. v. Calabrian Chemicals Corp.,* 656 F.Supp. 160, 163–68 (S.D.N.Y.1987), and found that the manifest disregard doctrine is a creature of domestic arbitration cases, and that whatever the concept means, it "does not rise to the level of contravening 'public policy' as that phrase is used in Article V of the Convention," and that "the 'manifest disregard' defense is not available to [respondent] within the context of the Convention." *Id.* at 165. *See also Merrill Lynch v. Bobker,* 808 F.2d 930, 933–34 (2d Cir. 1986); *Parsons & Whittimore Overseas Co., supra,* 508 F.2d at 977.

We observe that it is only coincidence that the substantive law selected by the parties to be applied in this dispute happens to be the domestic law of a jurisdiction which we from time to time are called upon to apply. It could just as fortuitously have been the domestic law of Botswana or the Ukranian Soviet Socialist Republic, both countries being contracting members under the Convention at the time of its

ratification by the United States. We cannot understand how the Convention, created to assure consistency in the enforcement of foreign arbitral awards, would not be gravely undermined, if judges sitting in each of the many jurisdictions where enforcement may be obtained, were authorized by the Convention to undertake a de novo inquiry into whether the law the arbitrators said they were using was or was not properly applied by them. The plain answer is that the Convention does not, and could not, contemplate such a chaos.

■ We find no merit in ISEC's claim that the interest component of the Award is penal in nature, ISEC Mem. at 43–45. In this court arbitral awards containing comparable and even higher rates of interest have been enforced as non-penal. *See American Construction Machinery, supra,* 659 F.Supp. at 428; *Brandeis Intsel Ltd., supra,* 656 F.Supp. at 170.

ISEC next argues, relying largely upon a 31 year old case in which the New York Civil Court interpreted the German American Treaty of Friendship, Commerce and Navigation of 1956, and entered a money judgement in which it fixed the interest, that the grant in this case of post-Award interest through the date of payment, was not proper. The case is inapposite, for entirely obvious reasons. In any case, we note that in *American Construction Machinery, supra,* the Court enforced a foreign arbitral award under the Convention which provided for "interest at the rate of 17% on [the damages] until the date of payment." 659 F.Supp. at 428.

ISEC also argues that, should this court enforce the Award, "the rate of interest after the Court's entry of judgment is a matter of federal law and is determined by the federal statutory rate of interest, 28 U.S.C. § 1961." ISEC Mem. at 45. We disagree. The statute by its terms applies to "any money judgment in a civil case recovered in a district court." Bridas is not here seeking entry of a money judgment, nor have the parties provided in their arbitration agreement, as is often done, that judgment may be entered upon an award in a particular court. Rather, Bri-

das has cross-petitioned for entry of an order enforcing a foreign arbitral award under the New York Convention. "[A] confirmation proceeding [under the Convention] is not an original action, it is, rather in the nature of a post-judgment enforcement proceeding." *Fertilizer Corp. of India v. IDI Management, Inc.,* 517 F.Supp. 948, 963 (S.D.Ohio 1981). We note that Judge Haight, in *Brandeis Intsel Ltd., supra,* 656 F.Supp. at 170, concluded that section 1961, "absent a showing that under foreign law the interest is penal in nature," did not preclude, in a case under the Convention, a pre-award interest rate of 11.25%.

We therefore find no merit to any defenses raised by ISEC to defeat enforcement of the Award.

Accordingly, ISEC's Petition to vacate the award is dismissed for lack of subject matter jurisdiction and Bridas' Cross–Petition to enforce the Award of the arbitral panel is in all respects granted. The Clerk of the Court is directed to enter judgment in accordance with this order.

SO ORDERED.